**KINNEAR–WEED CORPORATION,**
Plaintiff,

v.

**HUMBLE OIL & REFINING COMPANY, Defendant.**

**Civ. A. 2363.**

United States District Court
E. D. Texas, Beaumont Division.
Sept. 28, 1956.

William E. Kinnear, Beaumont, Tex., for plaintiff, Kinnear-Weed Corp.

Nelson Jones, General Counsel, Humble Oil and Refining Co., Houston, Tex., for defendant, Humble Oil & Refining Co.

Garrett R. Tucker, Jr., Houston, Tex., B. D. Orgain, Orgain, Bell & Tucker, Beaumont, Tex., for defendant.

CECIL, District Judge.

1. Plaintiff, Kinnear-Weed Corporation, is a Texas corporation having its principal office and place of business in Beaumont, Texas. Plaintiff is the owner of U.S. Patents Nos. 2,380,112 and Re. 23,416, both issued to C. W. Kinnear, the subject matter of which is a rotary drill bit for drilling oil and gas wells. These patents constitute plaintiff's principal assets and plaintiff's only business is the exploitation of these patents.

2. Defendant, Humble Oil & Refining Company, is a Texas corporation having its principal office and place of business in Houston, Texas. Defendant is engaged in the business of producing, refining and marketing petroleum and petroleum products. Defendant is not in the drill bit business, but does use drill bits in the drilling of its oil and gas wells. Defendant has an office and does business in the Eastern District of Texas.

3. Plaintiff charges defendant with breach of a confidential relationship, unfair competition, patent infringement and violation of the Federal and Texas anti-trust laws. All of these claims involved, and are inextricably connected with, the above-mentioned two Kinnear patents, Nos. 2,380,112 and Re. 23,416.

4. In addition to this suit, plaintiff has sued Hughes Tool Company, Reed Roller Bit Company and Hunt Tool Company, all of Houston, Texas, for infringement of the same two patents, as well as for violation of confidential relationship and unfair competition. These suits are pending in the United States District Court for the Southern District of Texas, Houston Division.

5. In rotary drilling, a bit is attached to the lower end of a string of pipe known as the "drill stem" which is rotated by machinery located at the surface. The cutting elements on the bit cut or crush the formation into small chips. Mud laden water known as drilling fluid is pumped down through the drill stem

and out through water courses in the bit onto the cutters, the formation being drilled, or both. The drilling fluid cools and lubricates the bit and also removes the chips produced by the bit, carrying them upwardly through the annular space between the drill stem and the wall of the hole, to the surface.

6. Rotary drill bits fall into the following generally recognized categories, depending upon the cutting elements on the bit:

    (a) Drag bits

    (b) Cone bits

    (c) Cross-roller bits

    (d) Combination bits

7. Drag bits have one or more blades with sharp, chisel-like cutting edges as their only cutting elements. They are normally used for drilling in relatively soft formations, such as sand and shale, and accomplish drilling by means of the dragging or scraping action of the cutting edges on the formation. Drag bits having two blades are commonly known as "fish-tail" bits by reason of their shape. Drag bits have been used in the Gulf Coast since approximately 1900.

8. Cone bits normally have either two or three cone-shaped cutters, which are usually equipped with a plurality of sharp teeth. The cones are mounted on axles or spindles, and as the bit rotates, the cones roll over the bottom and accomplish drilling by means of the crushing or chipping action of the teeth on the formation. These bits have no blades of any kind and the cones cut the entire bottom of the hole. Cone bits have been used in the Gulf Coast since approximately 1910. Originally intended for drilling hard formations only, such as rock, bits of this type have gradually been modified and improved with the result that cone bits are now capable of drilling through practically all formations, hard and soft, and have to a great extent replaced drag bits, which now account for a very small percentage of the total bits used. The cone bit was pioneered and developed primarily by Howard R. Hughes, Sr. and the Hughes

Tool Company, which is the largest manufacturer of drilling bits in the world.

9. Cross-roller bits have two independent sets of rolling cutter elements equipped with cutting teeth. The first set consists of a pair of outer-roller cutters, which cut the outer bottom portion of the hole; the other set consists of two or more roller cutters mounted on an axle or axles disposed between the outer roller cutters at substantially right angles to the axles of the outer-roller cutters. Cross-roller bits have no blades and the entire bottom of the hole is cut by the rolling cutters. Like cone bits, cross-roller bits were originally intended for drilling hard formations, such as rock, and accomplish drilling by the crushing or chipping action of the teeth on the formation being drilled. They have been used in the Gulf Coast area almost as long as cone bits.

10. Combination bits have both roller cutters and one or more blade-type cutters. Generally, the roller cutters are mounted on the inner sides of a pair of downwardly extending legs, and the blade is positioned between the roller cutters. Combination bits are intended to be used in alternating hard and soft formations. In actual practice, however, their use is largely confined to drilling the surface hole, i. e., the first thousand or so feet of the well. Relatively few combination bits are used in comparison with the other types, particularly cone and cross-roller bits.

11. Plaintiff contends that C. W. Kinnear conceived the idea of positioning the water courses in the bit body so that the streams of drilling fluid discharged therefrom would miss the cutting elements and strike directly on the bottom of the hole in what plaintiff refers to as "a concentrated stream" or a "direct blast". Plaintiff further contends that this concept is disclosed and claimed in the two patents in suit, was disclosed by C. W. Kinnear to defendant in confidence prior to the issuance of either of the patents in suit, was utilized by defendant to its own advantage in the drilling of its wells, was disclosed by defendant to

others in violation of such confidence, was wrongfully appropriated and publicized by defendant as defendant's own development and was monopolized or attempted to be monopolized, and was used by defendant to restrain trade, in violation of the anti-trust laws.

12. Defendant denies that C. W. Kinnear invented the concept of positioning the water courses in a bit so that the drilling fluid would miss the cutters and strike directly on the bottom of the hole, denies that the patents in suit disclose or claim any such concept, denies that C. W. Kinnear disclosed such concept (or any other information) to defendant in confidence, denies that defendant utilized, disclosed to others or published any information obtained by it from C. W. Kinnear, denies that it has competed unfairly with C. W. Kinnear, or his successors in interest, including plaintiff, denies that the patents in suit are valid or have been infringed by defendant, denies that defendant has violated any of the anti-trust laws and denies that Kinnear, or his successors in interest, including plaintiff have been injured by any act of defendant.

13. On January 2, 1942, C. W. Kinnear filed an application in the U. S. Patent Office entitled "Drill", disclosing a combination bit having a pair of disk-shaped outer-roller cutters mounted on the opposite side faces of a fish-tail blade, with two pairs of water courses through the bit body, one pair positioned to discharge drilling fluid directly onto the tops of the outer-roller cutters and the other pair positioned to discharge drilling fluid onto and wash down the opposite side faces of the fish-tail blade and thence onto the bottom of the hole. The applicant asserted claims to the entire combination bit and to the structure of the outer-roller cutter per se. The Patent Office rejected the claims to the entire combination bit, but allowed two claims covering the roller cutter per se, and U. S. Patent No. 2,380,112 was issued to C. W. Kinnear on July 10, 1945 containing these two claims.

14. On June 7, 1946, Kinnear applied for a reissue of a patent on the ground that, as the result of inadvertence, accident or mistake, the original patent did not fully set forth and claim his true invention. During the prosecution of the reissue application, the two claims of the original patent covering the roller cutter per se were rejected by the Patent Office and were abandoned by the applicant, but eventually the patent was reissued on October 16, 1951, as Re. 23,-416, with 18 claims (Nos. 3–20). The two claims of original Patent No. 2,380,-112 form no part of Re. 23,416.

15. In the Spring of 1945, after receiving notice from the Patent Office that the two claims covering the roller cutter per se had been allowed on his original application, Kinnear called on Douglas Ragland, an employee of defendant. Kinnear explained his bit to Ragland and told Ragland the status of his patent application. This was the first contact between Kinnear and defendant concerning or relating to the subject matter of this suit. The purpose of Kinnear's visit was to induce defendant either to finance the manufacture of Kinnear's bit or to purchase and test some of his bits. Ragland explained to Kinnear that, as a matter of policy, defendant was not interested in financing manufacture of the bit, but that defendant would be willing to test the bit. Thereafter in 1945 and 1946, defendant purchased approximately 52 bits from Kinnear. These bits were made in accordance with Patent No. 2,380,112, substantially as shown by the wooden model, Plaintiff's Exhibit No. 9. Defendant used approximately 22 of these bits in tests and junked the remaining 30, after concluding that the Kinnear bit was less satisfactory than competitive bits.

16. At no time did defendant request Kinnear to furnish any information to defendant. All information given by Kinnear to defendant was volunteered by Kinnear in his efforts to interest defendant in financing the manufacture of, or in purchasing, his bits. Kinnear did not

ask defendant to keep any information confidential and defendant did not promise or agree to keep confidential any information received by it from Kinnear.

17. The information disclosed by Kinnear to defendant consisted of the contents of Kinnear's original patent application (including the notice of allowance of the two claims on the roller cutter per se), some machine shop drawings showing the actual dimensions of his bit and his wooden model, Plaintiff's Exhibit No. 9. At no time did Kinnear furnish to defendant any information concerning his invention which was not contained in the patent application or shown by the drawings and/or the wooden model.

18. The drawings and the wooden model which Kinnear showed defendant simply illustrated the bit disclosed in his application. Accordingly, Patent No. 2,-380,112 discloses everything of substance which Kinnear told any employee of defendant with reference to his invention.

19. Prior to his first contact with defendant in the Spring of 1945, Kinnear had discussed his bit with the leading bit manufacturers in the Houston area, including Hughes Tool Company, Reed Roller Bit Company and Hunt Tool Company, and had disclosed to each of these substantially the same information he later disclosed to defendant, including his patent application, drawings of his bit and his model.

20. All of defendant's acts of which plaintiff complains, including the alleged publication and disclosure to others of information received from Kinnear, and use of "jet" bits and "jet" drilling, occurred after the issuance of Patent No. 2,380,112.

21. Kinnear sold a few of his bits to other oil operators in addition to the bits he sold to defendant in 1945 and 1946. Each of these bits disclosed to the public the way in which it was constructed. Any competent mechanic could have duplicated the Kinnear bit after examining one of the bits which Kinnear sold and any competent driller on seeing such a bit would have known how to use it for drilling wells.

22. The term "jet drilling" as used in the industry means a technique which consists of utilizing the available horsepower on a given drilling rig in the most efficient manner by correlating properly all of the various factors affecting the rate of penetration, including (1) rate of fluid circulating through the bit, (2) fluid velocity through the bit nozzles, (3) speed of rotation of the bit, (4) amount of weight maintained on the bit, and (5) annular rising velocity.

23. The term "jet bit" as used in the industry means a bit having the following characteristics:

(1) water courses properly sized to give the maximum product of nozzle fluid velocity and rate of circulation for a given hydraulic system,

(2) water courses lined with erosion resistant material so that they will retain their most efficient diameter throughout the useful life of the bit, and

(3) water courses so positioned that the high velocity fluid issuing therefrom will not destroy or damage the cutting elements of the bit through erosion, which means, as a practical matter, that the streams of drilling fluid issuing from the water courses should not strike the cutting elements of the bit.

24. Kinnear did not furnish defendant any information concerning "jet drilling" or "jet bits".

25. Neither of the patents in suit contains a disclosure of "jet drilling" or "jet bits".

26. The technique of "jet drilling" was developed by defendant as the result of a research program into the hydraulic factors affecting the rate of penetration in rotary drilling, which was commenced in 1943, was formalized as Research Project 4025 on January 1, 1946 and was intensified as equipment and personnel became available in the years immediately following the War. This program involved primarily a series of "short interval" tests conducted on a number of defendant's drilling rigs under actual

field conditions, wherein all but one of the various factors known to affect the rate of penetration would be held constant while the remaining factor would be varied from minimum to maximum within practical limits and the results recorded. The data obtained from these tests enabled defendant's engineers to determine the relative importance of the several factors involved, and to correlate these factors in order to achieve optimum efficiency in drilling. For example, it was discovered that the rate of penetration was greatest when the *product* of nozzle fluid velocity and rate of circulation (frequently referred to as "QV") was at a maximum, rather than when either of these factors alone was at a maximum. These data also enabled defendant's engineers to predetermine the most efficient set of drilling conditions for any given drilling operation, including, in particular, selecting the diameter of the nozzle in the bit which would produce the maximum QV.

27. Defendant's engineers also discovered, as a result of this research project, that when the bit was equipped with nozzles of the proper diameter to produce a jet stream having the maximum QV, the velocity of the jet stream was so great that (a) the nozzles had to lined with an extremely hard, erosion resistant material or they would become enlarged very quickly and would no longer be the proper size, and (b) the cutting elements of the bit had to be protected from the abrasive effects of the high velocity jet streams, either by hard surfacing or, preferably, by directing the streams so as to miss the cutting elements and hit the bottom of the hole. Both the lining of nozzles with erosion resistant material and the positioning of the nozzles so as to discharge drilling fluid directly onto the bottom of the hole, missing the cutters, were old long before the inception of defendant's research program. For example, in 1938 the defendant used a large number of so-called "parabolic blade" bits having water courses so positioned as to discharge streams of drilling fluid directly on the bottom of the hole ahead of the blade. Hard metal nozzles were used to protect bit water courses from fluid erosion at least this early.

28. Defendant's initial experiments were with drag bits and defendant obtained from various bit manufacturers drag bits equipped with tungsten carbide nozzles of varying diameters for use under different drilling conditions, the nozzles being positioned so as to direct the high velocity jet streams onto the bottom of the hole, ahead of the blade, rather than onto the blade. These bits obtained and used by defendant commencing in 1946, were the first of the so-called "jet" bits.

29. Defendant's drilling crews, using "jet" drag bits and applying the technique of "jet" drilling, achieved significant increases in rate of penetration and over-all drilling efficiency in a number of instances.

30. Commencing in 1948, defendant's engineers published a series of technical papers containing the results of defendant's research program and explaining the principles of "jet" drilling with "jet" drag bits.

31. In 1948 defendant requested several of the leading bit manufacturers, particularly Hughes Tool Company and Reed Roller Bit Company, to furnish defendant with rock bits suitable for use in "jet" drilling. The conventional rock bit in general use at that time had relatively larger water courses than those used in "jet" drag bits with which defendant had previously experimented. Moreover, the water courses in conventional rock bits in most instances were not lined with abrasion resistant material and they discharged in whole or in part upon the cutting elements. In order to convert their conventional rock bits to "jet" bits, the bit manufacturers relocated the nozzles so that the jet streams would not strike the cutters, equipped the nozzles with erosion resistant material and, generally, reduced the total nozzle area. None of these changes presented any difficult or unusual problems to the bit manufacturers since bits

had been made for many years which incorporated water courses positioned to discharge drilling fluid onto the bottom of the hole missing the cutters and nozzles made of erosion resistant material. Moreover, bits had been made for many years with water courses as small as those found desirable for "jet" drilling. The first "jet" rock bits were furnished to defendant by the bit manufacturers during the latter part of 1948 and early 1949. Defendant's tests indicated that these "jet" rock bits, when used in accordance with the "jet" drilling technique, would drill faster than conventional rock bits under many drilling conditions.

32. As the result of defendant's successful use of the experimental "jet" rock bits, the bit manufacturers went into large scale commercial production of "jet" rock bits. Hughes Tool Company's first production line jet rock bit was the so-called "Iron Pants", which came on the market early in 1950. Reed Roller Bit Company followed suit with its "Liquid Blast" cross-roller jet bit about the same time. These were followed by Hughes "Integral Jet" rock bit and by Reed's "Twin Blast" rock bit in 1952.

33. Approximately 30 per cent of the rock bits now being manufactured are of the "jet" type. The large percentage of conventional rock bits still being manufactured is due to a number of factors, including the additional cost of "jet" bits, the increased over-all cost of "jet" drilling and the failure of "jet" bits to outperform conventional bits under many drilling conditions.

34. In addition to the technical papers published by defendant's engineers, defendant published two articles in its house organ, "The Humble Way", one in 1950 and another in 1952, summarizing in non-technical language the results of defendant's work with "jet" bits and "jet" drilling. This magazine is distributed by defendant throughout all 48 states to its stockholders and to others interested in the oil business.

35. Defendant summarized the results of its research work, including its development of "jet" drilling, in periodic reports submitted to its affiliate, Standard Oil Development Company, pursuant to a contract between these two corporations providing for the sharing of the benefits and the expenses of research conducted by each. This information was in turn transmitted by Standard Oil Development Company to other members of the Standard group with which it had similar arrangements.

36. No information disclosed by Kinnear to defendant was used by defendant in developing or practicing "jet" drilling, in using "jet" bits, in obtaining "jet" bits, from bit manufacturers, nor was any such information included in defendant's reports to its affiliates, in the technical articles on "jet" drilling, or in the two Humble Way articles on "jet" drilling.

37. None of the information furnished by Kinnear to defendant in connection with Kinnear's alleged invention and/or the bit which he sold to defendant and which defendant tested and then discarded, was used by defendant for any purpose other than the testing and evaluation of the Kinnear bit. Defendant made no unauthorized disclosures of this information to others and made no agreements with bit manufacturers which pertained to Kinnear's alleged invention and/or bit or to anything which Kinnear disclosed to defendant.

38. Defendant has not manufactured any bits, and has not "palmed off" as its own or as those of bit manufacturers any bits incorporating any invention or idea of Kinnear or of plaintiff.

39. Defendant has committed no fraudulent or unfair trade practice in connection with jet drilling or jet bits, or in connection with any invention of Kinnear, or in connection with anything disclosed by Kinnear to defendant.

40. Plaintiff has never made or sold a bit. The business which Plaintiff claims was interrupted or damaged by defendant was new and unestablished. Kinnear never manufactured or sold bits on a commercial basis, and he lost mon-

ey on the bits he did manufacture and sell.

41. Plaintiff has suffered no injury or damage as a result of any act of defendant alleged in Paragraphs 10, 11 and 12 of the Complaint.

42. The publication by defendant of articles on "jet" drilling, complained of by plaintiff, occurred more than two years before the filing of this suit and such publication was known to plaintiff or its predecessors at or shortly after the time it occurred.

43. Defendant did not enter into any of the unlawful agreements, combinations or conspiracies alleged in Paragraph 12 of the Complaint.

44. Defendant did not monopolize or attempt to monopolize trade or commerce, as alleged in Paragraph 12 of the Complaint.

45. Defendant did not interfere with the consummation of a business deal between plaintiff or its predecessors and Houston Oil Field Material Company, as alleged in Paragraph 12 of the Complaint.

46. Defendant did not interfere with the sale of bits by plaintiff and/or plaintiff's predecessors, as alleged in Paragraph 12 of the Complaint.

47. Defendant has committed no act prohibited by the Federal or Texas antitrust laws nor has defendant injured the public by any of the acts alleged in Paragraph 12 of the Complaint.

48. In its claim of patent infringement, plaintiff charges that defendant has infringed both Patent No. 2,380,112 and Re. No. 23,416 by using drill bits having water courses so positioned that the streams of drilling fluid issuing therefrom strike directly upon the bottom of the hole without first striking the cutting elements of the bit. Plaintiff has specified 19 different bits, each of which it contends infringes its patents. These bits are made by 8 different bit manufacturers. All of the accused bits are "jet" bits. Some of them are drag bits, some are cone bits, some are cross-roller bits, and some are combination bits.

49. Defendant contends that it has not infringed either of plaintiff's patents by its use of any of the accused bits or by any other act. Defendant further contends that Patent No. 2,380,112 was extinguished by the grant of Reissue No. 23,416, and that Reissue No. 23,416 is invalid because of anticipation and lack of invention over the prior art.

50. The specification and drawings of Re. 23,416 are the same as the specification and drawings of Patent No. 2,380,-112, except that the reissue contains one additional "object" of the alleged invention in column 2, lines 28 through 39. The claims of Re. 23,416, of course, are different from those of Patent No. 2,-380,112. Plaintiff contends that claims 3 through 19 of the reissue are infringed by defendant's use of the accused combination bits, that claims 13 through 16 are infringed by defendant's use of the accused cone and cross-roller bits, and that some or all of the claims are infringed, through application of the "doctrine of equivalents", by defendant's use of the accused drag bits. Plaintiff concedes that none of the claims covers the method of "jet" drilling or any other method.

51. The disclosure of both patents is confined to a specific type of combination bit, which has a pair of disk-shaped outer-roller cutters mounted on spindles extending outwardly from the opposite side faces of a fish-tail blade. Several embodiments of this bit are shown. The principal embodiment has a plain fish-tail blade. In the other embodiment the fish-tail has slots in its cutting edge in which small, individual roller cutters are mounted. Two of the four water courses through the bit body are positioned to discharge drilling fluid on top of the two outer-roller cutters. The other two water courses are positioned to discharge drilling fluid onto and wash down the front faces of the cutting blades and thence onto the bottom of the hole. The apparent purpose of the applicant was

to provide a bit capable of drilling through alternating hard and soft formations, which is the intended purpose of all combination bits.

52. Neither of the patents contains any disclosure of any bit other than a particular type of combination bit. There is no mention in either of the patents of drag bits, cone bits or cross-roller bits. There is no indication in either of the patents that the subject matter of the alleged invention was the positioning of the water courses. There is no suggestion in either patent that any of the water courses should be so positioned that the drilling fluid issuing therefrom would be discharged so as to miss the cutters and strike directly onto the bottom of the hole. On the contrary, the drilling fluid discharged from each of the water courses of the bit disclosed in the patents would hit the cutting elements.

53. Neither patent discloses or mentions the use of abrasion resistant material in the water courses or nozzles. Neither patent even suggests the existence of an erosion problem. Long prior to the date of Kinnear's alleged invention, the use of abrasion resistant material in the water courses or nozzles or drill bits was well known, as shown by the publication "Fusion Facts", October, 1938, pp. 194–196 (Defendant's Exhibit 148).

54. Neither of the patents discloses the drilling conditions under which the tool shown therein is to be used. Specifically, there is no disclosure of the pump pressure, circulating rate, nozzle velocity, rotating speed, weight on the bit or annular rising velocity, these being among the factors which were known long prior to the date of Kinnear's alleged invention to affect the rate of penetration and which defendant correlated in developing its "jet" drilling technique. The only reference to pressure in the patents is in the expression:

"It being remembered that flushing fluid under high pressure will dislodge and cut a great amount of the cuttings from the bottom of the well hole."

Prior to Kinnear the industry had used pump pressure as high as 2500 pounds per square inch, which is in excess of the pressures generally used today even in practicing jet drilling.

55. Neither of the patents discloses the size of any of the water courses other than to refer to the lower pair (discharging down the front faces of the blade) as "large fluid course ducts" and the upper pair (discharging onto the outer-roller cutters) as "smaller fluid course ducts". However, no dimensions are given. Moreover, there is no disclosure in either of the patents of the existence of an optimum nozzle size to achieve the maximum QV under a given set of drilling conditions, nor that the nozzle size should be changed so as to maintain the maximum QV as the other drilling conditions change during the drilling of a well.

56. The word "blast" which is used in the patents in suit to describe the action of the drilling fluid on the bottom of the hole has no particular significance in this art and is not defined in the patents. If the term is to be given any meaning at all, it must mean the same thing as the term "jet", which has been used to describe the action of drilling fluid on the bottom of the hole since the inception of rotary drilling.

57. The Patent Office file histories of both patents clearly show that at least up until the summer of 1951 (by which time "jet" bits had gained considerable popularity and were being widely used in the drilling industry) Kinnear regarded himself as the inventor of nothing more than the particular form of combination bit actually disclosed in his patents. The oath executed by the applicant on June 3, 1946 and filed with his application for reissue states that the invention for which the reissue patent was sought consists of "the combination of a fish-tail type drill for removing soft formation from the bottom of a bore hole and a roller type drill for removing

hard formation". In that oath the applicant further described his invention as a drill bit having "a body * * * whose lower portion is reduced in thickness forming a shank, and terminating at its lower end in a blade, or blades, having forwardly directed cutting edges adapted to operate against the bottom of the bore * * * with spindles anchored to the opposite sides of the shank whereon roller cutters are mounted and positioned to operate against the outer bottom portions of the bore".

58. With respect to the positioning of the water courses in his bit, Kinnear represented to the Patent Office that he considered the positioning of the lower pair of water courses so that the drilling fluid discharged therefrom would wash down the front faces of his fishtail blade, as a part of his alleged invention. In this connection, Kinnear distinguished his invention over that shown in the Waxler Patent No. 2,198,849, which had been cited by the Patent Office, by arguing that Waxler's water courses were so positioned that the flushing fluid issuing therefrom would "blast" out some distance in front of the drag blades and that it would be "impossible" for the drilling fluid in Waxler's bit to wash down the front faces of his drag blades. Kinnear used the same argument to distinguish his invention over the Scott patent No. 1,850,358. During the course of the prosecution of the original patent, Kinnear amended many of his claims to recite that the lower water courses were so positioned that fluid issuing therefrom would discharge "directly onto and wash down" the front faces of the blades.

59. Kinnear also represented to the Patent Office, for the purpose of distinguishing his alleged invention from the prior combination bits cited by the Examiner, that none of the latter showed the mounting of the outer-roller cutters on spindles attached to the opposite side faces of the blade as in his construction, but instead showed the outer-roller cutters mounted on a pair of downwardly and outwardly extending legs.

60. Claims 3 through 12 of Re. No. 23,416 appeared in the reissue application as claims 5 through 14. These claims were rejected by the Patent Office on the ground of estoppel and also on the ground that the claims lacked invention over the prior art. From the Examiner's rejection of claims 5 through 14, Kinnear appealed to the Patent Office Board of Appeals. The Board of Appeals disagreed with the Examiner on the question of patentability, stating:

"We have compared claims 5 to 14, inclusive, with the prior art cited by the Primary Examiner, and we do not find in the latter the specific relation of the elements recited in these claims, which require that the spindles be mounted on the opposite side faces of the reduced portion of the body. For the reason that we do not agree with the position of the Primary Examiner to the effect that reducing the shank of the bit does not affect the operation of the bit in connection with the specific arrangement of fish-tail and rolling cutters, we are not of the opinion that patentability of these claims is denied by this prior art."

However, the Board of Appeals affirmed the rejection of the claims on the ground of estoppel.

61. On April 15, 1949, Kinnear appealed from the decision of the Board of Appeals to the United States District Court for the District of Columbia, under R.S. § 4915, 35 U.S.C.A. §§ 145, 146. This proceeding terminated in a judgment dated February 9, 1951, Kinnear v. Marzall, D.C., 95 F.Supp. 55, holding that the applicant was not estopped to make claims 5 through 14, that the Patent Office had erred in rejecting those claims on the ground of estoppel and ordering the Patent Office to issue Kinnear a patent for those claims. The court confined its decision to the question of estoppel and did not pass on the question of patentability, expressly stating that the patentability question was not before it.

62. In compliance with the judgment of the District Court, prosecution was resumed before the Patent Office. In an amendment dated June 26, 1951, the applicant sought to add claims 21 through 34, some of which read directly upon the Hughes' tri-cone jet bits and others on the Reed "Liquid Blast" bits, both of which were then on the market. These same bits are among the accused bits which plaintiff alleges infringe its patents. In this amendment, Kinnear mentioned for the first time the expression "jet" drilling, and these were the first claims asserted by Kinnear reading on any "jet" bits. The Examiner refused to enter this amendment on the ground that the subject matter of claims 21 through 34 was not disclosed in the specification. Kinnear did not appeal from the Examiner's refusal to enter the amendment and thereafter never again asserted those claims or claims of a similar scope.

63. By amendment dated August 1, 1951, Kinnear added claims 35 through 42 to his application, representing to the Patent Office that these claims were "based on" the subject matter of claims 5 through 14, which had previously been held to be allowable by the District Court. Relying upon this representation, the Patent Office allowed claims 35 through 42 without further examination, and these claims now appear as claims 13 through 20 of the reissue patent.

64. Each of the claims of the reissue patent calls for roller cutters, in so many words, as an essential element of the claimed combination. None of the accused drag bits embodies any sort of roller cutters nor any equivalent structure.

65. Each of the claims of the reissue patent, when properly construed, calls for a drag type blade (either with or without small roller cutters mounted therein) as an essential element of the claimed combination. In this connection, claims 3 through 12 and claims 17 through 20 call for "cutting blades", "blade", "fish-tail type of drill", "forward cutting edges", "oppositely arranged cutting blades", and a "drag type blade" in describing the inner cutter. These terms obviously could apply only to a drag type blade. Although claims 13 through 16 employ the term "cutting elements" to describe the inner cutter, this term is defined in the specification as consisting of either a plain drag type blade, as shown in Figs. 1, 2, 3, 11 and 12, or a drag type blade having slots with small roller cutters mounted therein, as shown in Figs. 8, 9 and 10. None of the accused rock bits (either cone or cross-roller type) embodies any sort of blade nor equivalent structure.

66. Each of the claims except 5, 6 and 12 calls for a bit body whose lower portion is reduced in thickness forming opposite side faces and terminating in oppositely arranged cutting blades or cutting elements. Claims 5 and 6 call for a similar structure, described as a "shank" terminating in a forward cutting edge. None of the accused rock or combination bits embodies such a construction, but on the contrary all such bits are provided with downwardly extending legs which increase, rather than decrease, the size of the bit body at its lower end.

67. Claim 12 calls for spindles having free ends which diverge upwardly and outwardly from the body of the bit. None of the accused bits has spindles with free ends diverging upwardly and outwardly, nor any equivalent structure.

68. Claims 4 through 8, 10 and 11 call for reaming side margins on the fishtail blades. None of the accused combination bits has side reaming margins on its cutting blades, nor any equivalent structure.

69. Claims 3, 9, 10, 12 and 14 through 19 specify that the flushing fluid issuing from the discharge nozzles is forced between the inner face of a roller cutter and the reduced portion of the bit body through channels or open spaces formed by the sides of the roller cutters and the faces of the reduced body portion. None of the accused bits embodies such a construction nor any equivalent structure.

70. Claims 13 through 16 call for "outer" roller cutters mounted on the

body of the bit which, in view of the drawings and specifications of the patent, means that they are mounted wholly outside the body of the bit. In all of the accused bits having rolling cutters, which includes all of the accused bits other than drag bits, the roller cutters are mounted within the body of the bit, rather than on the outside of the body of the bit.

71. Claim 19 calls for a bit with roller cutters having a particular type of notched tooth structure which is not found in any of the accused bits.

72. Claim 20 calls for a bit with a drag type blade having slots with roller cutters mounted therein for cutting the inner bottom part of the well hole. None of the accused bits is provided with such a structure, nor any equivalent structure.

73. Reissue Patent No. 23,416 is not a pioneer patent, it being simply an improvement patent in a very crowded field.

74. The claims of the patent are so-called "combination" claims, the alleged invention residing entirely in the combination of the elements recited therein, rather than in the elements themselves, each of which was old and well known at the time the original application was filed.

75. Kinnear was not the inventor of the combination bit, as such. Combination bits were known to the art at least as early as 1915, when Bardeen obtained Patent No. 1,136,203. The other references cited by the Patent Office during the prosecution of the Kinnear applications show that the idea of the combination bit was old long before Kinnear.

76. The following references, none of which were considered by the Patent Office during prosecution of the patents in suit and each of which preceded Kinnear's original filing date by more than one year, show that it was old and well known to position the water courses in a bit body so that the drilling fluid issuing therefrom would miss the cutters and strike directly on the bottom of the hole:

(a) Drag bits, and patents and publications relating thereto:

Greenhead (Defendant's Exhibit 1)

Hughes (Defendant's Exhibits 18 and 16)

Dunlop (Defendant's Exhibits 97 and 98)

Lauderback Patent No. 1,727,655

Ragsdale Patent No. 1,961,390

Harrington Patent No. 1,962,589

Composite Catalogue of Oil Field and Pipe Line Equipment (1939 Edition), pages 750, 751 and 754.

Oil Weekly, March 26, 1926, pages 32, 34, 72, 74, 76, 77, 78 and 80.

Oil & Gas Journal, February 22, 1940, page 72.

(b) Cone bits, and patents and publications relating thereto:

Hughes Tool Company's 1911 tri-cone (Defendant's Exhibit No. 31)

Hughes Patents No. 1,256,694 and 1,143,273

Murphy Patent No. 1,647,740

Simpson Patent No. 1,730,301

Collins Patents No. 1,945,258 and 1,992,992

Wright Patent No. 2,049,581

Zublin Patent No. 2,184,067

Oil Bulletin, December 1929, page 1350.

(c) Cross-roller bit, patents and publications:

Reed Patent No. 2,047,110

Williams Patent No. 2,058,750

Catland Patents No. 2,063,012; 2,066,671; 2,068,375; 2,087,500; and 2,089,466.

Zublin Patents No. 2,121,112 and 2,201,570

Composite Catalogue of Oil Field and Pipe Line Equipment (1938 Edition), page 267.

Composite Catalogue of Oil Field and Pipe Line Equipment (1940 Edition), page 716.

Hughes Patent No. 1,327,913

(d) Miscellaneous bits, patents and publications:

Hughes disk bits (Defendant's Exhibits 32, 40 and 41)

Grant shale bit (Defendant's Exhibit 132)

Zublin "Simplex" bit (Defendant's Exhibit 113)

Zublin "Differential" bit (Defendant's Exhibit 114)

Hughes Patent No. 1,204,157

Composite Catalogue of Oil Field and Pipe Line Equipment (1940 Edition), pages 2544–2547.

77. Each of the bits referred to in Findings of Fact No. 76 was shown by clear and substantial proof beyond a reasonable doubt to have been made, sold, and used more than one year prior to the filing date of Kinnear Patent No. 2,-380,112.

78. The positioning of the water courses in the accused bits so that the drilling fluid issuing therefrom misses the cutters and strikes directly on the bottom of the hole simply follows the teaching of the prior art.

79. If any of the claims of Reissue Patent No. 23,416 were stretched so as to cover any of the accused drag bits, such claim would read on and be anticipated by each of the prior art references identified in Findings of Fact No. 76(a).

80. If any claim of Reissue Patent No. 23,416 were stretched to cover any of the accused cone bits, such claim would read on and be anticipated by each of the prior art references identified in Findings of Fact No. 76(b).

81. If any claim of Reissue Patent No. 23,416 were stretched to cover any of the accused cross-roller bits, such claim would read on and be anticipated by each of the prior art references identified in Findings of Fact No. 76(c).

82. Plaintiff did not establish a date of invention prior to approximately August 20, 1941, this being the date the draftsman who prepared the original patent drawings first saw Kinnear's drawings of his bit.

83. The following patents, each of which preceded Kinnear's filing date by more than one year, show that it was old and well known to position water courses in the body of a combination bit so that the drilling fluid issuing therefrom would miss the cutters and strike directly upon the bottom of the hole:

Waxler 2,198,849

Kammerer 2,049,543

Moreover, each of the following patents shows that it was old and well known to mount roller cutters on the inner sides of a pair of downwardly extending legs in a combination bit:

(a) Patents which issued more than one year prior to Kinnear's filing date:

Sorensen Patent No. 1,394,769

Scott Patent No. 1,932,487

Kammerer Patent No. 2,049,543

Waxler Patent No. 2,198,849

(b) Patents for which applications were filed prior to the earliest date of invention established by Kinnear:

Kammerer Patents No. 2,244,537 and 2,320,136

84. The positioning of the water courses in the accused combination bits so that the drilling fluid issuing therefrom misses the cutters and strikes directly on the bottom of the hole, and the provision of roller cutters mounted on the inner sides of a pair of downwardly extending legs, simply follow the teaching of the prior art.

85. If any claim of Reissue Patent No. 23,416 were stretched so as to cover any of the accused combination bits, such claim would read on and be anticipated by each of the prior art references identified in Findings of Fact No. 83.

86. Because of the broad scope which Plaintiff asserts for the claims of Reissue Patent No. 23,416, the entire bit manufacturing industry and the entire oil industry are affected by and concerned with the validity of the claims of this patent.

87. Hughes Patent No. 1,204,157, granted in 1915, discloses a drilling bit having a body with a reduced lower portion, spindles mounted on the opposite side faces of the reduced lower portion and roller cutters mounted on these spindles. The reduced lower portion of the bit terminates in two parallel cutting edges which cut the inner bottom portion of the hole. The bit is provided with two pairs of water courses, one pair directing streams of drilling fluid onto the tops of the outer roller cutters, while the other pair directs the streams of drilling fluid onto the bottom of the hole between the cutting edges. In these respects, therefore, the bit disclosed by Hughes is essentially the same as the bit disclosed in the patent in suit even as interpreted by Kinnear. The cutting edges shown in the Hughes bit were intended to destroy the core left in the center of the hole by the outer roller cutters. This function was the same as the intended function of Kinnear's fish-tail blade. In addition, Hughes' cutting edges were intended to cut by a dragging or scraping action, which is the same action as that of Kinnear's fish-tail blade. Accordingly, Hughes' cutting edges were the mechanical equivalent of Kinnear's fish-tail blade. Therefore, the Hughes patent discloses all of the essential elements arranged in the same relation and performing the same functions as the bit disclosed and claimed in the Kinnear Patent No. Re. 23,416.

88. A person of ordinary skill in the drilling bit art, being familiar with the Hughes Patent No. 1,204,157, could have substituted a conventional fish-tail blade such as that of the Greenhead bit for Hughes' cutting edges, thereby arriving at substantially the same result achieved by Kinnear, without the exercise of invention.

89. The Hughes Patent No. 1,204,157 was not considered by the Patent Office during the course of prosecution of either Original Patent No. 2,380,112 or Reissue Patent No. 23,416.

90. Neither of the patents in suit achieved commercial success.

Conclusions of Law

1. Plaintiff has no cause of action against defendant for alleged breach of confidence (Paragraph 10 of the Complaint) for each of the following reasons:

(a) The essential elements of a cause of action for breach of confidence are

(i) possession by the plaintiff of knowledge or information which is not generally known,

(ii) communication of this knowledge or information by the plaintiff to the defendant under an express or implied agreement limiting its use or disclosure by the defendant, and

(iii) use or disclosure by the defendant of the knowledge or information so obtained in violation of the confidence, to the injury of the plaintiff.

The plaintiff has the burden of proving each of these elements. In this case, plaintiff has failed to prove a single one of these essential elements. On the contrary, the record clearly shows that none of these elements existed.

(b) No cause of action for breach of confidence can accrue to the owner of a patent who has revealed the subject matter thereof to another, by reason of the use or publication by the other after issuance of the patent, of said subject matter, since the issuance of the patent constitutes a publication of its subject matter to the world. In this case, all of the information which Kinnear disclosed to defendant is contained in Patent No. 2,-380,112, and plaintiff's sole complaint is that defendant used and published this information after the issue of the patent.

(c) No cause of action for breach of confidence can accrue to the owner of an alleged trade secret by reason of the use or publication of such secret by another, after the owner has revealed his secret to the public by the sale of articles incorporating the secret. In this case, all of the acts on the part of defendant of which plaintiff complains occurred after Kinnear sold the public bits incorporating his alleged trade secret.

(d) Plaintiff's claim is barred by the Texas two-year statute of limitation, Art. 5526, R.C.S.

(e) This being an action at law, plaintiff has the burden of proving that it has been damaged by defendant as an essential part of its cause of action. Plaintiff has failed to prove any such damage.

(f) The proper measure of damages in an action at law for breach of confidence is the plaintiff's loss of profits. Plaintiff failed to prove that it lost any profits on account of any act of defendant. Moreover, plaintiff's business is new and unestablished and the prospective profits of such a business are too speculative to form the basis of an award of damages.

2. Plaintiff has no cause of action against defendant for alleged unfair competition (Paragraph 11 of the Complaint) for each of the following reasons:

(a) The essence of a cause of action for unfair competition is the palming-off of the defendant's goods as those of the plaintiff, thus injuring the reputation or business of the plaintiff by causing the public to believe that the defendant's goods are those of the plaintiff. Unless such a palming-off is alleged and proved by the plaintiff, there can be no recovery for unfair competition. In this case, plaintiff failed either to plead or prove that defendant palmed off any of its goods as those of plaintiff.

(b) This being an action at law, plaintiff has the burden of proving that it has been damaged by defendant as an essential part of its cause of action. Plaintiff has failed to prove any such damage.

(c) The proper measure of damages in an action at law for unfair competition is the plaintiff's loss of profits. Plaintiff failed to prove that it lost any profits on account of any act of defendant. Moreover, plaintiff's business is new and unestablished and the prospective profits of such a business are too speculative to form the basis of an award of damages.

3. Plaintiff has no cause of action against defendant for alleged violation of the anti-trust laws (Paragraph 12 of the Complaint) for the following reasons:

(a) Under the Federal anti-trust laws, 15 U.S.C.A. §§ 1–7, 15 note, the essential elements of a private civil action for treble damages are:

(i) a violation by the defendant of some specific provision of the Federal anti-trust laws with consequent injury to the public, and

(ii) injury to the business or property of the plaintiff by reason of such violation.

The plaintiff has the burden of proving each of these elements. In this case, plaintiff has failed to prove the existence of either of these elements.

(b) The Texas anti-trust laws make no provision for a private civil action for violation thereof. Moreover, no violation of the Texas anti-trust laws has been shown.

4. Plaintiff has no cause of action against defendant for alleged infringement of Patent No. 2,380,112 because the grant of a reissue patent extinguishes the original. Plaintiff No. 2,380,112 was extinguished by the grant of Re. 23,416. Therefore, plaintiff can predicate no claim on Patent No. 2,-380,112.

5. In a patent infringement suit, the plaintiff cannot prevail unless the court finds the patent both valid and infringed. The plaintiff has the burden of proving infringement. Plaintiff has failed to prove that defendant has infringed any of the claims of Patent No. Re. 23,416. On the contrary, the record in this case clearly shows that, for one or more of the following reasons, all of the claims of the patent are limited to a specific form of combination bit and that these claims, as so limited, are not infringed by any of the accused bits:

(a) The claims of a patent define the scope of the monopoly granted to the patentee. Every term recited in a patent claim is a limitation on the patentee's monopoly and nothing is an infringement which does not fall within the terms which the patentee has chosen to express his invention. The claims must be interpreted in the light of the specification, and cannot be construed to cover anything different from or greater than the invention disclosed in the specification. In view of these principles, the claims of Re. 23,416 can cover no more than the specific form of combination bit illustrated and described in the patent. Such a bit has a pair of disk-shaped outer roller cutters mounted on spindles extending outwardly from the opposite side faces of a fish-tail blade (with or without small rollers mounted in slots in the cutting edge of the blade); the bit also has two pairs of water courses through the bit body, the upper pair being positioned to discharge drilling fluid directly onto the top of the outer roller cutters and the lower pair being positioned to discharge drilling fluid down the front faces of the fish-tail blade, in contact therewith. None of the accused bits embodies this specific construction or anything like it. Therefore, none of the accused bits infringes any claim of the patent.

(b) The claims of a reissue patent must be for the same invention as that disclosed in the original patent, and any claim of the reissue which is not for the same invention as that disclosed by the original is void. Patent No. 2,380,-112 disclosed nothing more than the specific form of combination bit described in subparagraph (a) above. Therefore, the claims of Re. 23,416 can cover nothing more than that specific form of combination bit and any claim purporting to cover more than that would be void.

(c) A patent owner is bound by the representations made by the applicant to the Patent Office during the prosecution of the patent as to the nature of his invention and the scope of his claims, where such representations were relied on by the Patent Office in granting the patent; and the patent owner is estopped from asserting a broader or more liberal interpretation of the claims of his patent in an infringement suit than the interpretation which the applicant gave to those same claims during the prosecution of the patent. Kinnear repeatedly told the Patent Office that his invention consisted of the particular form of combination bit described in subparagraph (a) above and the Patent Office relied on these representations in issuing the patents in suit. Plaintiff is bound by these representations and is estopped to assert a broader scope for the claims in this case than that urged by Kinnear in the Patent Office.

(d) Where an applicant represents to the Patent Office that certain additional claims are based on the subject matter of other previously allowed claims, and the additional claims are allowed by the Patent Office on the strength of such representation and without further examination, the additional claims so obtained cannot be construed more broadly than the previously allowed claims and cannot be infringed by any device which does not also infringe the latter. Since Kinnear represented to the Patent Office that Claims 13–20 were "based on the subject matter of" previously allowed Claims 3–12, and the Patent Office thereupon allowed Claims 13–20 on the strength of this representation and without further examination, these claims cannot be construed more broadly than Claims 3–12 and cannot be infringed by any bit which does not also infringe Claims 3–12. Claims 3–12 are obviously limited to the specific form of combination bit described in subparagraph (a) above and are not infringed by any of the accused bits. Therefore, Claims 13–20 must also be so limited and are likewise not infringed by any of the accused bits.

(e) Where the applicant has asserted and then abandoned certain claims during prosecution of the patent, the subject matter of the abandoned claims can-

not be revived and restored to the patent by reading such subject matter, by construction, into other claims which are allowed. During prosecution of Re. 23,416, Kinnear asserted claims reading directly on the accused Hughes cone and Reed cross-roller rock bits, but abandoned those claims when the Examiner refused to enter them on the ground that they were not supported by the disclosure. Accordingly, plaintiff cannot interpret any of the claims of the patent in such a way as to cover bits of this type.

(f) A patent claim which reads directly upon the prior art is invalid. A claim will not be so construed if any other construction is possible. The prior art of record in this case contains a great many bits with water courses so positioned as to discharge streams of drilling fluid directly onto the bottom of the hole, at or near the periphery thereof, without first hitting the cutters. Therefore, if the claims of the patent in suit were interpreted as covering the accused bits simply because they incorporate water courses so positioned, as plaintiff contends, the claims would read on all of the prior bits which had water courses similarly positioned, and would be invalid. In order to avoid this result, the claims must be limited to the specific combination of elements recited therein, which is described in subparagraph (a) above.

(g) Combination patents are patents in which the claimed invention resides in a specific combination or arrangement of elements, rather than in the elements themselves. Combination patents should be, they are, difficult to obtain. If sustained, they should be, they are, confined strictly to the particular combination claimed. In order to infringe a claim of a combination patent, the accused device must incorporate all the elements of the claimed combination, and omission of a single element avoids infringement. Under the "doctrine of equivalents", a primary or pioneer patent may be held to be infringed by a device which, while it differs in some re-

spects from the language of the claims, nevertheless functions in substantially the same way to perform substantially the same result. A combination patent, particularly one in a crowded art, is entitled to a very limited range of equivalents and is practically limited to the structure shown by the inventor. The doctrine of equivalents is never applied where there is an entire omission of a definite part of the claimed combination without anything being used to function in its place. Every claim of Re. 23,416 is for a combination of elements, the claimed combination consisting of, among other things, outer roller cutters and an inner blade type cutter (either with or without small rollers mounted in the blade). Since none of the accused drag bits have roller cutters or any equivalent thereof, and none of the accused cone and cross-roller bits have blades or any equivalent thereof, these bits cannot infringe any claim of the patent.

(h) Where the accused device is constructed in accordance with the teachings of the prior art, and differs from the claimed invention in the very feature upon which patentability of the latter was predicated, there can be no infringement. The accused combination bits are all constructed in accordance with the teachings of the prior art, and differ from Kinnear's alleged invention in the very feature of the latter which the Patent Office regarded as patentable, this being the way in which the outer roller cutters are mounted on the bit body. Kinnear mounted his outer roller cutters on spindles extending outwardly from the opposite side faces of the reduced lower portion of the body, whereas the accused combination bits follow the prior art in mounting in the outer roller cutters on the inner sides of a pair of downwardly extending legs. Therefore, none of the accused combination bits infringe any claim of the patent.

6. There being no infringement, plaintiff has no cause of action against defendant on Patent No. Re. 23,416.

7. Where an entire industry is affected by and concerned with the ques-

tion of validity vel non of a patent, as is true in the case of the patent in suit, the Court should decide the validity question, and should not dispose of the suit on the ground of non-infringement alone.

8. Unless the subject matter of a patent involves both novelty and invention, the patent is invalid, since mere novelty, without invention is insufficient. The question of invention involves the whole of the prior art, and the patentee is charged with knowledge of all of the prior art extant at the time of his alleged invention, whether actually known to him or not. The mere exercise of the skill of the calling does not amount to invention, nor is it invention to combine old elements with no change in their respective functions. Kinnear did no more than to exercise the skill of the art in combining a group of old and well known elements with no change in their respective functions, and produced nothing which another person of ordinary skill in that art could not have duplicated. Accordingly, what he did does not rise to the dignity of invention and the patent in suit is invalid for that reason.

9. Where all of the essential elements claimed in a later patent are disclosed in a prior patent, arranged in the same relation and performing the same functions, the prior patent anticipates the later and the later patent is invalid. Accordingly, the patent in suit is anticipated by Hughes Patent No. 1,-204,157 and is, therefore, invalid.

10. The usual presumption of validity attaching to an issued patent disappears when it is shown that the Patent Office failed to consider the most pertinent prior art. The Patent Office failed to consider the Hughes Patent No. 1,204,157, as well as many other of the most pertinent references during the prosecution of the patent in suit. Accordingly, the patent is not entitled to the usual presumption of validity, and this conclusion is not affected by the fact that the patent was issued as the result of a suit under R.S. 4915.

11. The doctrine of "commercial success" has no application to the facts of this case since the patent in suit has not achieved commercial success. In any event, commercial success cannot take the place of invention.

12. Plaintiff's suit for alleged infringement of Patent No. Re. 23,416 must be dismissed for invalidity of the patent as well as non-infringement by defendant.