**G & G FISHING TOOLS SERVICE et al.,**
**Appellants,**

v.

**K & G OIL TOOL & SERVICE CO., Inc.,**
**et al., Appellees.**

No. 6966.

Court of Civil Appeals of Texas.

Texarkana.

Sept. 12, 1957.

Rehearing Denied Oct. 10, 1957.

**638**

Arnold & Stidham, Thomas O. Arnold, Allen & Allen, Claude T. Allen, Houston, for appellant.

Cooper K. Ragan, Robert Eikel, John L. Russell, Houston, for appellee.

DAVIS, Justice.

K & G Oil Tool & Service Company, Inc., et al., hereinafter referred to as K & G, and John J. Kirby, II, plaintiffs-appellees, sued G & G Fishing Tools Service et al., hereinafter referred to as G & G, five other corporations, two partnerships, and nine individuals for damages for alleged theft of a trade secret and for injunction permanently enjoining the defendants from the use of the alleged trade secret. Judgment was rendered for appellees for damages in the sum of $22,000 and a permanent injunction was issued against several of the defendants. Suit as to the other defendants was dismissed during the trial. The remaining defendants-appellants appeal.

In 1951, appellee Kirby constructed a tool or device known and referred to as a "magnetic fishing tool." An application for patent was made, and a license to manufacture the tool was issued by Kirby to K & G, which was incorporated about September 1951, for the purpose of manufacturing and leasing or renting the tool.

During the latter part of 1951 and the early part of 1952, the tool was put on the open market and was used extensively in Texas, Oklahoma, and possibly other states. Early in March of 1952, K & G contacted a representative of G & G in Duncan, Oklahoma (G & G at that time having a well-established oil field fishing business), and made arrangements to lease a room or space from G & G at Duncan, Oklahoma, to store several of the magnetic fishing tools, and further made arrangements with G & G to sub-lease the magnetic fishing tool (which was labeled K & G even though the invention was by Kirby) on a percentage basis; G & G to retain 25% of any sum collected as rentals for use of the tool or tools.

The magnetic fishing tool manufactured by Kirby is a tubular-shaped device ranging in size from 3¼ inches to 11½ inches in diameter, outside dimensions. It is so constructed that it can be attached to the end of a drill pipe used in drilling oil and gas wells. Inside the lower end of the tool is a core of Alnico metal which can be energized with a powerful quantity of magnetism. It was constructed for the purpose of fishing pieces of drill bits and other metal that might be broken off at the bottom of a well during the process of drilling oil and gas wells. Magnetic fishing tools were not new to the oil field drilling industry at the time of the construction of the tool which is the controversy of this lawsuit. The tool involved in this case was also constructed so it would permit circulation of drilling mud through the tool such as is done in rotary drill bits. Such circulation is as old as rotary drilling.

Kirby is not the inventor of Alnico metal. He did not discover the fact that Alnico metal could be highly energized with magnetism.

At the time K & G made a trade with G & G to store the magnetic fishing tool in G & G's office in Duncan, Oklahoma, appellees contend that a contract was made whereby G & G would not break open the

K & G tool or attempt to duplicate it. Both Kirby and K & G emphatically deny that he or any representative of K & G confided the alleged secret of the tool to either of the defendants or a representative of defendants.

After March and prior to August 15, 1952, a representative of G & G approached a representative of K & G and demanded a higher percentage of the rentals of the K & G tool, and informed K & G that unless a higher percentage of the rentals was paid to G & G, then G & G would manufacture and use its own magnetic fishing tools. K & G declined the higher percentage and in September 1952, G & G placed its first magnetic fishing tools upon the market that could be attached to the end of a drill pipe and permit circulation as in rotary drilling. A representative of K & G was notified of the fact and Kirby, the alleged inventor of the magnetic fishing tool, immediately went from Houston to Odessa, Texas, and there saw one of the G & G tools. Kirby testified upon the trial of the case that he examined the G & G tool without breaking it down and used only a flashlight and a piece of wire to examine the G & G tool and could tell from such examination that the G & G tool was exactly like the K & G tool upon which Kirby had a patent claim pending. The record is not too clear, but it seems that appellees knew that G & G was working to manufacture a magnetic fishing tool to be attached to the end of a drill, as early as June, 1952. At no time did K & G or Kirby say or do anything in opposition to the manufacture and use of a magnetic fishing tool by G & G until August 20, 1953, the date their suit was filed. They knew at all times that more and more such magnetic fishing tools were being manufactured and placed on the open market by G & G. Appellees also knew that the manufacture of such tools involved expenditure of large sums of money.

Prior to the time that G & G commenced the manufacture and use of magnetic fishing tools on the end of drill pipe and permitting circulation, K & G had already placed its tool on the open market, and widely and extensively advertised the same and displayed it in different oil shows.

Among the defenses of the appellants was: (1) The K & G tool had been placed on the open market prior to the time G & G commenced manufacturing and using such magnetic fishing tool and that the secret of the K & G fishing tool, if any, was lost by the marketing of same; (2) the K & G tool could be copied by an ordinary machinist without breaking it down; (3) all the secret, if any, of the K & G tool was contained within the tool itself and it was not necessary to acquire any knowledge from the alleged inventor to duplicate the tool; and (4) the appellees were guilty of laches in not taking action immediately, if any action they had, to stop appellants from making and using such magnetic fishing tool and expending large sums of money.

There was neither pleading nor proof on the part of appellees that would define with any degree of exactness the trade secret the appellants are alleged to have stolen.

In response to special issues the jury found that: (1) Appellants agreed not to disassemble the K & G magnetic fishing tool; (2) it was understood that the purpose of the agreement was to guard against anyone's determining the internal construction of the magnetic fishing tool by examining the interior thereof; (3) G & G, prior to August 15, 1952, disassembled the K & G magnetic fishing tool for the purpose of making examination thereof; (4) the disassembling of such tool by G & G was for the purpose of examining the interior construction thereof; (5) the disassembling of such tool by G & G was for the purpose of making a similar tool; (6) G & G used the information obtained from this disassembling of the K & G magnetic fishing tool to make one substantially the same as the K & G magnetic fishing tool; (7) the magnetic fishing tool made by G & G is substantially the same as the one then being used by K & G and their affiliated interests;

(8) prior to March 1952, the internal construction of the K & G magnetic fishing tool was not known to persons engaged in oil well fishing business; (9) the G & G magnetic fishing tool was not constructed from information obtained exclusively from sources other than the disassembly of the K & G magnetic fishing tool (we will note here that there is no jury finding that there is any such other information, if any, which was obtained from Kirby or any representative of K & G, and the evidence does show that representatives of G & G did confer with many experts in the field of mechanics and magnetics in connection with the construction of the G & G magnetic fishing tool) ; (10) appellees knew that A. C. Green, Jr., (one of the appellants) was making a magnetic fishing tool during August 1952; (11) appellees knew at all times from August 1952 to the date of filing of this suit that appellants were manufacturing magnetic fishing tools; (12) appellees were familiar in a general way with the cost of manufacturing magnetic fishing tools such as those that were being manufactured by appellants; (13) K & G did not at any time before or during the use of the warehouse of G & G at Duncan, Oklahoma, ever disclose to any person other than employees or others in a confidential relationship the internal construction of the K & G magnetic fishing tool; (14) *the internal construction of the K & G magnetic tool can be determined by an examination of the tool without disassembling it to the extent that another tool can be constructed that would perform the same function by substantially the same means employed by the K & G magnetic tool* (emphasis added) ; and, (15) the amount of the net profits derived by appellants up to and before February 4, 1954, by reason of leasing and renting of the G & G magnetic fishing tool was $22,000.

The trial court disregarded the findings of the jury to Special Issues 10, 11, 12, 13 and 14, rendered judgment for appellees for the sum of $22,000, and issued a permanent injunction against appellants enjoining them and each of them from " * * * making, using, selling, manufacturing, operating, copying, or otherwise representing themselves to be manufacturers, lessors or operators of magnetic fishing tools substantially the same as that of plaintiffs herein and from using in any way the confidential information obtained by defendants from an examination of plaintiffs' magnetic fishing tool; * * *" Hence the appeal.

Appellants bring forward nine points of error. No complaint is made of the sufficiency of the evidence to support the jury finding, nor the criterion used in attempting to show damages. See Wissman v. Boucher, 150 Tex. 326, 240 S.W.2d 278.

By Point 1 they complain of the action of the trial court in disregarding the jury's finding to Special Issue No. 14, that the internal construction of the K & G magnetic tool could be determined by an examination of the tool without disassembling it to the extent that another tool could be constructed that would perform the same function by substantially the same means employed by the K & G magnetic fishing tool.

The trial court stated in its judgment that there was no evidence to support the submission of Special Issue No. 14. In this finding the trial court erred. There is an abundance of evidence that the K & G magnetic fishing tool could be copied without breaking it down. One witness who had never seen such a magnetic fishing tool prior to the trial of this case sat upon the witness stand, examined the K & G tool without breaking it down and made a drawing to within a 2% exactness of the K & G magnetic tool within and without. There is no contention that a magnetic fishing tool made in accordance with that drawing would not perform substantially the same function as the K & G magnetic tool. Kirby, the alleged inventor, as hereinabove pointed out, testified that he examined a G & G magnetic fishing tool, without breaking it down, using only a flashlight and a piece of wire, and he could tell that the internal construction of the G & G tool

was exactly like the K & G tool. Kirby's own testimony is some evidence that the K & G tool could be copied without breaking it down. There was also testimony by Mr. Green and two other machinists that the tool could be copied without breaking it down.

■ The construction of the magnetic fishing tool involved in this suit was an improvement over prior magnetic fishing tools by providing a means of attachment of magnetic fishing tools to the end of a drill stem instead of a cable and providing for the circulation of drilling mud through the magnetic fishing tool and around the magnetic core so that the magnetic fishing tool could be forced to the bottom of the well by a process of the circulation of drilling mud. Magnetism is as old as the North Pole; Kirby is not the inventor of Alnico metal; neither did he discover the effect of the combination of magnetism and Alnico metal. Circulation in the drilling of oil wells is as old as rotary drilling. Attaching a magnetic fishing tool to the end of a drill bit that permits circulation is nothing novel. The magnetic fishing tool is a combination of known elements and articles. Both K & G and G & G tools were introduced in evidence. The tools themselves present some evidence that they could be copied without breaking them down; therefore, the case of Wissman v. Boucher, supra, is controlling and, we think, directly in point. Actually, all the alleged secret being contained within the tool itself, being capable of being copied without breaking it down, and having been marketed directly by appellees and through others, widely exhibited, and advertised by appellees, appellants were only some of the many people who knew about the alleged secret. Therefore, we find that no trade secret was involved. Wissman v. Boucher, supra; Kinnear-Weed Corp. v. Humble Oil & Refining Co., D.C., 150 F.Supp. 143; Brown & Root, Inc. v. Jaques, Tex.Civ. App., 98 S.W.2d 257, no writ history. Point 1 is sustained.

Appellants' chief complaint in their Point 2 is that there is no pleading nor proof that would define the alleged trade secret. No authorities are cited that the alleged trade secret must be defined in the pleadings and proof. Several other matters are complained of in the point which renders the point multifarious. The point is overruled without discussion.

■ By Point 3, appellants complain of the action of the trial court in disregarding the jury's findings in Special Issues Nos. 10, 11 and 12, in which findings the jury convicted appellees of laches. Appellees knew for a year or more that appellants were manufacturing and using magnetic fishing tools and such manufacture involved the expenditure of large sums of money. The evidence discloses that appellants had expended in excess of a quarter of a million dollars in such business prior to the filing of the suit. Appellees do not offer the remotest excuse for not taking immediate action to prevent the manufacture and use of the magnetic fishing tool by appellants. Neither do appellees contend that they were lulled into apathy by promise of remuneration by appellants for use of the trade secret, if any, or that they, appellees, were prevented by appellants from taking any action. In fact, appellants were stimulated by the inaction of appellees into expending large sums of money that could have been averted by prompt action on the part of appellees, if any cause of action they had. Los Angeles Heights Independent School District v. Chestnut, Tex.Civ.App., 287 S.W. 693, no writ history; Barksdale v. Allison, Tex.Civ.App., 210 S.W.2d 616, no writ history. The point is sustained.

■ By Points 4, 5 and 9, appellants complain of the action of the trial court in issuing a permanent injunction against them. Appellees admit they were not entitled to any damages after a patent was issued to Kirby on February 4, 1954 (appellees' secret, if any, was made public at

that time.) Appellees were not entitled to damages from appellants after the secret, if any, was made public. An injunction will not lie to prevent any wrong or violation of any right by appellants toward appellees that does not result in damages to appellees. 43 C.J.S. Injunctions § 29–a, pp. 459–460, *injuria sine damno.* Such injunctive remedies are equitable for injuries and cannot be properly used as a means for punishment. Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754. The question of damages for the alleged theft of the trade secret becomes moot with the issuance of the patent which made the secret, if any, public. State courts have no jurisdiction in any cause of action the appellees have or may assert to enjoin the infringement of the patent, or to recover damages for infringement. 28 U.S.C.A. § 1338, and authorities collated thereunder. The case of Brown & Root, Inc. v. Jaques, supra, is the only Texas case to which we have been cited or which we have found in which a patent was issued after suit was brought for misuse of a trade secret. In that case the court held, 98 S.W.2d at page 258:

"*Up to the time Jaques was granted a patent,* his right to protection of his invention was *as* a trade secret." (Emphasis added.)

In the case of Newport Industries, Inc. v. Crosby Naval Stores, Inc., 5 Cir., 139 F.2d 611, 612, the court said:

"A process that is a secret cannot be one that is patented; because full disclosure, so that the public may know how to use it when the patent expires, is the consideration for the monopoly given the patentee for a limited time."

In the case of Conmar Products Corp. v. Universal Slide Fastener Co., 2 Cir., 172 F.2d 150, 156, the court, speaking through Judge Learned Hand, states the rule as follows:

"* * * we do not see why a wrongful inducement to divulge the disclosure (of the secret) before issue

(of the patent) should deprive the wrongdoer of his right to avail himself of the patentee's dedication; for, as we have just said, the contract is to be construed as imposing secrecy only until issue (of the patent). The doctrine (of granting injunction after patent issues) must rest upon the theory that it is a proper penalty for the original wrong to deny the wrongdoer resort to the patent; and *for that we can find no support in principle. Thus any possible liability for exploiting whatever the patents in suit disclosed, ended with their issue.*" (Emphasis added.)

Points 4, 5 and 9 are sustained.

Appellants' Points 6, 7 and 8 have been carefully considered, found to be without merit, and are respectfully overruled.

For the errors hereinabove pointed out, the judgment of the trial court is reversed and judgment is here rendered that appellees take nothing; and, further, the injunction issued by the trial court is hereby set aside and is in all things dissolved.