**Victor E. BAUM, Appellant,**

v.

**JONES & LAUGHLIN SUPPLY CO., and Cabot Shops, Inc., Appellees.**

**No. 5213.**

United States Court of Appeals
Tenth Circuit.

May 24, 1956.

Forrest A. Wilson, Newton, Kan., for appellant.

Herbert P. Kenway, Boston, Mass., and Gordon F. Rainey, Oklahoma City, Okl. (Kenneth W. Brown, Boston, Mass., and J. Ronald Johnston, Tulsa, Okl., on the brief), for appellees.

Before BRATTON, Chief Judge, and MURRAH and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

Victor E. Baum, the owner of Patent No. 2,273,342, brought this suit for damages, alleging in the first cause of action an infringement of the patent which relates to an adjustable mounting for a horsehead used on walking beams employed on pumps in oil fields. In the second cause of action, it is alleged that the defendant, Cabot Shops, Inc., incorporated in its oil pumping equipment a feature of the patent which had, prior to patent, been disclosed to its officials in confidence. The subject matter of each cause of action is the same.

One of the defenses was that the patent was invalid because its teachings were anticipated by the prior art and did not constitute an invention. The trial court found that the structure defined in the claims of the patent was known and in public use for more than two years prior to the filing of the application for patent on August 29, 1936.[1]

As to the second cause of action, the court found that Baum's apparatus was known to the public before any disclosure was made to the defendants. This is an appeal from the judgment dismissing the complaint.

The patent discloses an improved pump jack with an adjustable horsehead for use on pumping equipment in oil fields, which is designed to impart a straight-line vertical movement to the pump rods, resulting in a minimum of wear on the pump rods, packing, and other parts of the equipment. It is designed to move an oil well pump rod up and down in a vertical manner, as is necessary for efficient operation of the conventional pump. This is accomplished by a supporting block on the end of a walking beam, having a curved upper surface over which a mating curved surface of the horsehead fits, permitting a rotation when the securing bolts are loosened.[2] The upper end of the pump rod passes through a stuffing box forming a pressure-tight seal at the casinghead. This portion of the pump rod is called a "polish rod".

We are concerned here only with the adjustable horsehead on the pump jack which is employed to move the pump rod up and down. The pump jack, as it is described in the patent, is the ordinary pump jack frame mounted on a concrete base supporting at its top point a bearing saddle, or fulcrum, which provides a pivoted mounting for a horizontal walking beam. One end of the beam is connected with the source of power and the other end to the upper portion of the polish rod. When power is applied, the ends of the walking beam move up and down in an arc, the center of which is the saddle bearing on top of the jack frame. This up and down movement, through the pump rods, causes a reciprocation of the pump piston in the bottom of the well.

It was obvious to engineers that some method was necessary to cause the polish rod to move up and down in a vertical plane, rather than follow the arc made

1. Findings Nos. 4 and 9 (Pp. 22–23 of Record) read:

"4. The structure defined in Claims 1, 4, 5 and 10 of Patent No. 2,273,342, was known and in public use prior to August 29, 1934 (Exhibits 8, 17 through 26, 45, 46 and 49)."

"9. In constructing its adjustable horsehead, Cabot Shops, Inc. has merely employed features of design and principles of operation that were well known and in the public domain prior to August 29, 1934 (see exhibits outlined in paragraph 4 above). Furthermore, the exact construction of Baum's own adjustable horsehead was fully known to the public prior to the above-mentioned 1938 meeting."

2. Claim 4 of the Patent, which is typical of those in suit, reads: "4. A pumping jack including, a pivoted beam, a supporting block secured to one end of the beam and having its upper surface curved transversely of the beam, an arcuate segment having a supporting element which is curved complementary to the curvature of the plate, whereby the segment may be swung on the beam in a plane at a right angle to the longitudinal axis of the beam, and means for fastening the segment in any one of its adjusted positions on the plate."

by the end of the beam. To remedy this difficulty, there was introduced into the art an arcuate segment, known as a "horsehead", which was fastened to the end of the beam, immediately above the polish rod. The horsehead was attached to the polish rod by two flexible steel cables which, when the beam was oscillated, rode on the curved face of the horsehead. The cables are free to move, the result being that when the beam is at the bottom of its stroke they rest only on the upper portion of the horsehead, as it moves upward in its stroke the cables meet the face of the horsehead at progressively lower points on its outer face. Consequently, the cables remain vertical with the polish rod.

There are a number of misalignments which may occur between a walking beam and the pump rods. The plaintiff says that all except one may be controlled in the installation of the pump unit. Generally steel "I" beams are used for the walking beams. There are certain manufacturing tolerances in the flanges which cause a slight misalignment when the horsehead is attached. It is this misalignment which Baum contends his patent is designed to remedy.[3] It is contended that the prior art disclosed no method for an adjustment of the horsehead after it was attached to the beam. It is stated that if there were a misalignment of the horsehead caused by manufacturing tolerances in the "I" beam, the cables would not pass over the face of the horsehead parallel to its edges, but at an angle, resulting in the failure to obtain a straight lift when the beam is oscillated; that Baum's patent disclosed, for the first time, a method by which the face of the horsehead could be adjusted, through about three degrees, by the use of bolts in a slot, or in holes larger than the bolts, thereby placing the edges of the horsehead parallel with the polish rod and insuring a vertical lift.

The evidence is undisputed that prior to 1932, the Gulf Oil Corporation manufactured and put in public use, a pump jack which employed a horsehead, adjustable from side to side, to accomplish the same results as the Baum horsehead. The Gulf jack used a tubular beam and the horsehead slipped over the end and was secured with bolts which were inserted in holes larger than the bolts, permitting a lateral adjustment. Referring to the Gulf jack, a competent engineer testified as follows:

"A. These three photographs show one of the Gulf jacks, showing the movement of the horse-head from side to side when the bolt is * * * when the bolts rather that hold it in place on the beam are loosened.

"The Court: Is that the same principle? Now these are the same machines here, 35–A, B, and C, are the type as No. 8, the ones in the front of the book? A. They are. In fact, I believe, Your Honor, one of the same jacks is shown.

"The Court: Same ones? A. Yes, sir.

---

3. In his brief, in discussing the customary misalignments and the purposes of his patent, Baum says, (Pp. 4–6):
 "From the foregoing discussion, it will be apparent that there are four general types of misalignments that can occur in pumping equipment: (1) longitudinal misalignment, i. e., the end of the beam is set to one side or the other of the polish rod and out of the longitudinal plane, (2) transverse misalignment, i. e., the end of the beam is either set beyond or short of the polish rod and out of the transverse plane, (3) misalignment of saddle bearings, i. e., the bottom flange of the beam is not set parallel with the ground, and (4) rolling mill tolerance in the beam. It is of extreme importance to note that of these four types of misalignments, the first three are within the control of the unit setter and do not concern the Baum invention in any way. However, the fourth type of misalignment, that caused by rolling mill tolerances, is not within the control of the unit setter since he must take the "I" beams as they come to him on location. It is toward correction of this latter type of misalignment that the Baum invention is directed."

"The Court: Is the similarity, is this the same principle used there? All I am trying to seek right now is I just want to know the answer to that question. Is this the same principle that is used by that patent of the plaintiff in his two surfaces that fit together? A. It is exactly the same, sir.

"The Court: And any person that would know that this operates this way would know that an I-beam could be operated in the same way? A. Yes, sir.

"The Court: In other words, it wouldn't take great skill or I mean any genius to figure that out? A. Not in my opinion."

The National Supply Company, long prior to Baum's horsehead, marketed a beam hanger employing a curved upper surface with a mating curved surface, which allowed the hanger to rotate laterally for the same type of adjustment as in Baum's horsehead.

■ Baum readily concedes that the elements of his combination were known and used long prior to his invention. It is the combination which he contends is new and patentable. Of course a combination of known elements may be patentable. As was stated in Lyman Gun Sight Corp. v. Redfield Gun Sight Corp., 10 Cir., 87 F.2d 26, 27:

"A union of selected old elements may constitute a patentable combination if by reciprocal or co-operative action on a common objective a new and useful result is affected or an old result is attained in a more facile, economical and efficient manner."

See also Oliver United Filters, Inc., v. Silver, 10 Cir., 206 F.2d 658, 662. But, "Neither does the production of a new device by the rearrangement or manipulation of known elements through application of ordinary mechanical skill constitute invention although it may have required study, effort, and experimentation. Concrete Appliances Co. v. Gomery, 269 U.S. 177, 46 S.Ct. 42, 70 L.

Ed. 222; Saranac Automatic Machine Corp. v. Wirebounds Patent Co., 282 U.S. 704, 51 S.Ct. 232, 75 L.Ed. 634; Electric Cable Joint Co. v. Brooklyn Edison Co., 292 U.S. 69, 54 S.Ct. 586, 78 L.Ed. 1131."

■ "Where a patent includes a combination of elements, it is not necessary to establish anticipation that all of the elements be found in a single earlier patent or in a single device previously in general use. It is enough if the evidence, taken as a whole, discloses that all of the claimed elements are found in different prior patents in the art or in different devices previously in general use, and no new functional relationship arises from their combination. Busell Trimmer Co. v. Stevens, 137 U.S. 423, 11 S.Ct. 150, 34 L.Ed. 719; Linville v. Milberger, 10 Cir., 34 F.2d 386; Reflectolyte Co. v. Luminous Unit Co., 8 Cir., 20 F.2d 607." Lyman Gun Sight Corp. v. Redfield Gun Sight Corp., supra, 87 F.2d at page 28.

■ This court recently considered the same subject in United States Air Conditioning Corp. v. Governair Corp., 10 Cir., 216 F.2d 430, 432, where it was said: "When the respective individual functions of the elements assembled are not changed and where they produce no result other than the added results of such functions, there is a mere aggregation of elements. When the elements are so united that by their reciprocal influence upon each other, or by their joint action on a common objective, they perform additional functions and accomplish additional results, the union is a true combination. The result must be due to the joint and cooperative action of all the elements, not a mere aggregation of the several results of the separate elements acting independently; it must be the product of the combination and not a mere aggregate of several results, each a complete product of one of the combined elements." See also Hutchinson Mfg. Co. v. Mayrath, 10 Cir., 192 F.2d 110. The "merely making a known element of a known combination adjustable by a means of adjustment known to the art, when no new or unexpected result

is obtained is not invention." Marconi Wireless Telegraph Co. of America v. United States, 320 U.S. 1, 32, 63 S.Ct. 1393, 1408, 87 L.Ed. 1731.

In Hutchinson Mfg. Co. v. Mayrath, supra, 192 F.2d at page 113, it is said that "where a patentee brings together old elements in a mechanism, involving no new principle, to produce an old result, although he produces a machine that is more efficient and hence more useful in the art, it is still the product of mechanical skill and not of invention." Smith v. Hall, 301 U.S. 216, 232, 57 S.Ct. 711, 81 L.Ed. 1049; Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 486, 55 S.Ct. 455, 79 L.Ed. 1005.

■ The evidence is clear that the Baum horsehead accomplishes the exact result of the prior art, possibly in a somewhat more satisfactory manner, but in substantially the same way. The only contribution it made to the art was that of appearance in having the wire cables maintain a position parallel with the edges of the horsehead, rather than at an angle. Although there was some conflict, growing out of a mathematical computation, the testimony of a number of engineers is to the effect that if there are no grooves in the face of the horsehead, the fact that the wire lines cross the horsehead at an angle is of no importance functionally. The Gulf arrangement was complete and capable of producing the same result as Baum's horsehead. Considering the evidence as a whole, we agree with the trial court that the patented apparatus was old and did not constitute an invention.

■■ There is no merit to plaintiff's second cause of action. If not barred by the statute of limitations, there is no evidence that the information alleged to have been given to representatives of defendants was given in confidence. Furthermore, prior to this alleged disclosure, Baum granted licenses to manufacture his machine and published bulletins describing his pump jacks. He testified that before that disclosure, his invention was in use throughout a substantial portion of the Mid-Continent area. This constituted a public disclosure. Annotation 170 A.L.R. 455, 469, Note 4. Actually, there was no trade secret which could be disclosed, the principle of the adjustment of the horsehead by rotary movement being known to the industry long prior to Baum's disclosure. Northup v. Reish, 7 Cir., 200 F.2d 924.

Affirmed.