**THOMSON MACHINERY COMPANY**

v.

**Royal J. LaROSE, Edward P. Clause and LaRose-Clause, Inc.**

v.

**Byron C. THOMSON, Estival Aysen, Roland Clement, Ruby Thibodaux and Victor L. Wintz.**

**Civ. A. No. 7222.**

United States District Court
E. D. Louisiana,
New Orleans Division.
July 17, 1969.

R. J. Mawhinney, A. R. Theibault, Wilkinson, Mawhinney & Theibault, Washington, D. C., Harvey Peltier, Donald Peltier, Peltier & Peltier, Thibodaux, La., for Thomson Machinery Co. and third-party defendant Byron C. Thomson.

Edmond L. Deramee, Sr., Edmond L. Deramee, Jr., Deramee & Deramee, Thibodaux, La., George Garvey, B. Edward Shlesinger, Sr., Shlesinger, Arkwright, Garvey & Dinsmore, Arlington, Va., for Royal J. LaRose, Edward P. Clause and LaRose-Clause, Inc.

Robert D. Morvant, Thibodaux, La., for Estival Aysen, Roland Clement and Ruby Thibodaux.

Paul G. Borron, Borron, Owen, Borron & Delahaye, Plaquemine, La., for Victor L. Wintz.

HEEBE, District Judge.

This cause came on for hearing on a previous day on objections filed by all parties to the findings of fact and conclusions of law rendered by the special master on the statement of the account, pursuant to Rule 53(e) (2) F.R.Civ.P. Having considered the arguments of counsel, having studied the legal memoranda submitted by both parties, and having considered the evidence presented to the special master, the Court is now advised in the premises and makes the following findings of fact and conclusions of law. Plaintiff, Thomson Machinery Company, and third-party defendant, Byron C. Thomson, will both be referred to as "Thomson." The defendants and third-party plaintiffs will be referred to as "Patent Holders."

## FINDINGS OF FACT

The Court agrees with and adopts the following findings of fact of the special master:

1. Only two machines with infringing turners were sold subsequent to the issuance of the patent (i. e., Patent Holders' Apparatus Patent 2,871,645, granted February 3, 1959, containing valid claim 4). (Report, page 2, no. 2)

2. The infringer derived a profit of $316.00 from the sale of the infringing devices. This is the only proof before the master upon which a judgment in this matter can be based. (Report, page 2, no. 3)

3. There has been no inducement on infringement such as is proscribed by 35 U.S.C. § 271(b). (Report, page 2, no. 4)

4. Except as noted above, there has been no sale by plaintiff-infringer of any component of any patented device subsequent to the issuance of the patent. (Report, page 2, no. 5)

5. Except as noted above, there has been no derivation of revenue by plaintiff-infringer from the sale of an infringing device, or a component thereof since the issuance of the patent. (Report, page 2, no. 6)

In addition to the above findings of fact made by the special master and adopted by the Court, we make the following findings of fact:

6. This case began when Thomson sought a declaration of invalidity and non-infringement for which purpose a suit under the Declaratory Judgment Act (28 U.S.C. § 2201) was brought by Thomson as plaintiff October 30, 1957 against Patent Holders' Method Patent No. 2,799,984, granted July 23, 1957.

7. When the Apparatus Patent No. 2,-871,645 was granted February 3, 1959, Patent Holders, as plaintiff in a third-party action, brought a second suit for infringement which was tried together with the first action on the Method Patent.

8. The judgment entered deals with both causes of action, and as such judgment is the basis for the accounting, the latter should dispose of all questions relating to the controversy involving both actions and both patents.

9. As the first action, for which Thomson was responsible as plaintiff, resulted in a holding of invalidity of both claims, being all the claims of the Method Patent, Thomson was the sole "prevailing party" under 35 U.S.C. § 285 and hence no attorneys' fees could properly be awarded to Patent Holders and no taxable or court costs could legally be assessed against Thomson.

10. As the second action, for which Patent Holders were responsible as plaintiff, resulted in a split decision in which, of the four claims of the Apparatus Patent, Claims 1, 2 and 3 were invalidated and only Claim 4 held valid, Patent Holders were not the "prevailing party" within the meaning of the decisional law construing 35 U.S.C. § 285, Union Carbide Corporation v. Graver, 345 F.2d 409, 413, 414 (2d Cir. 1965). Consequently, Patent Holders are not entitled in either action to an award of attorneys' fees or any taxable or other costs.

11. The prior case cited in the Report of the special master (page 6, line 1) of Zysset v. Popeil Bros., Inc., 167 F. Supp. 362 (N.D.Ill.1958) was a district court case, modified on appeal, 276 F.2d 354 (7th Cir. 1960), in an immaterial matter found to involve, besides patent infringement, an issue of unfair competition, ruled out of the instant case by the master, in which on further trial by the district judge, he denied allowance of any exemplary damages to the plaintiff but made an award of attorneys' fees, which award was reversed on appeal, 318 F.2d 701 (7th Cir. 1963). The *Zysset* case is not authority for the allowance of attorneys' fees under 35 U.S.C. § 285 or punitive damages under 35 U.S.C. § 284.

12. According to the testimony of Paul F. Oswald, the engineer, he went into business for himself in New Orleans and beginning on November 15, 1944, he acquired Thomson as a client, and in July 1948 he came to Thibodaux and entered the full-time employment of Thomson where he remained for four years and one month or until September 1, 1952, with the arrangement that he retain part-time employment with Thomson in his spare time and on weekends, which he did for the period September 1952 through October 14, 1954, at which latter date he resumed full-time employment with Thomson.

13. During the period 1952–1954 while Oswald was engaged in part-time employment for Thomson, he was in full-time employment in New Orleans with Edwards Engineering Company selling hydraulic equipment.

14. During the Spring and Summer of 1954 while Oswald was so part-time employed by Thomson, receiving numerous payments, Patent Holders approached Oswald to work out drives for their turner, for which Oswald received no payment from Patent Holders.

15. Oswald was not an employee of Patent Holders at any time. Oswald was actually trying "to sell his hydraulic equipment, Edwards Engineering hydraulic equipment, hydraulic pumps and valves and fluid motors, hydraulic rams," some at least of which were components of Patent Holders' turner, none of the above-named equipment being embodied in the Thomson infringing turner construction.

16. Oswald, on his resumption on October 14, 1954, of full-time employment with Thomson, testified: "Well, when I went back to work at Thomson Machinery Company, I heard there was work going on on a turner. I did not work on the turner for the Thomson Machinery Company. That work was carried out by some other members of the firm."

17. When asked by counsel for Patent Holders whether Thomson in 1955 did produce a cane-turning attachment as a part of the cane lifter, Oswald testified: "It did not start out as a cane turner. It started out as a lifting device to pick up lodged cane." This testimony shows that Thomson never detailed Oswald to engineer a cane turner.

18. Oswald spontaneously suggested to Thomson the modification of the fourth chain of the Thomson pick-up device (also called cane lifter or lifting device) which rendered that chain the infringing turner. In Oswald's own words: "I worked on the design of the cane lifter, and after we had experimented with it, and found out what it would do, it just was a natural thought to see,

on my part, that it would turn cane by a slight modification."

"Q. And you suggested that modification?

"A. I was responsible for it. Yes."

19. The slight modification suggested by Oswald to Thomson referred to in previous Finding 18 is identified by Toups, a witness called on behalf of Patent Holders at the hearing before the master on August 18, 1965 (TR. 57), by enclosing the Thomson infringing turner in a red pencil circle on plaintiff's (Thomson's) Accounting Exhibit 9 being a photograph. This construction is also identified by Thomson Accounting Exhibit 3 identified in the affidavit of Cameron L. Morvant to consist of a bar 5 affixed to the pick-up frame having a disc 6 on its outer end with a sprocket beneath the disc over which runs the chain with kickers, the construction giving the chain the appearance of a bow string. Save the chain with kickers, none of the other parts are found in the Patent Holders' construction. The chain with kickers for moving cane on Thomson cane harvesters has been used for many years prior to the invention of Patent Holders and is disclosed in prior patents of record—for instance in the Gray Patent No. 1,956,676 (R. 56).

20. The suggestions and engineering advice Oswald gave gratuitously to Patent Holders in building their turner was not the same suggestions and advice given to Thomson.

21. Oswald was well known to Patent Holders since July 1948 to be Thomson's engineer, defendant Clause, one of the joint patentees of the patents in suit, having been a co-employee of Thomson with Oswald from July 1948 to September 1952.

22. No showing has been made that Thomson ever requested Oswald at any time to perfect or work on any turner and no showing has been made that Thomson hired Oswald to perfect any turner. In the first sentence of Finding of Fact 7(a) beginning in line 2 from the bottom of page 2 of the

Report of the special master, the following errors appear:

i) By "plaintiff" the master intended Thomson, but as shown elsewhere, the Patent Holders were plaintiffs in the second action involving Apparatus Patent Claim 4 and Thomson was the captive defendant and Oswald was not at any time Patent Holders' engineer but at all times was Thomson's engineer.

ii) Aside from this critical reversal of the parties and the mistaken identification of Oswald as Patent Holders' engineer, the first sentence of 7(a) fails to state conduct on Thomson's part which is actionable. Thomson had every right to take the advice of his own engineer voluntarily offered even if that advice constituted skills acquired and proficiencies developed while working with Patent Holders, Hahn & Clay v. A. O. Smith Corp., 320 F.2d 166, 170, 171, 175 (5th Cir. 1963); Wexler et al. v. Greenberg et al., 399 Pa. 569, 160 A.2d 430 (1960), and unless "the knowledge gained from this engineer" (quoting from the Report) involved the breach of fiduciary relation, ruled out of the case by the special master in the first Conclusion of Law on page 5 of the Report, the vital element of such fiduciary relation involving as a *sine qua non* some identifiable trade secret, McGraw-Edison Co. v. Central Transformer Corp., 308 F.2d 70 (8th Cir. 1962), the pleading requirement being that the complaint must allege that there is a secret and that it has been used unlawfully (Trade Secrets by Ridsdale Ellis, 1953, page 318, Section 232), the burden of proof being on the Patent Holders that the secret is a protectable secret belonging to Patent Holders (Trade Secrets, *supra*, Section 236).

24. There is no legal significance in the next statement by the special master that, "Oswald's testimony, taken as a whole, indicates he was persuaded to return to Thomson's service," in face of the holding in Conmar Products Corporation v. Universal Slide Fastener Company et al., 172 F.2d 150 (2d Cir. 1949):

"As its third cause of action the plaintiff alleged that the defendants enticed away several of its employees and made use of information which they had acquired while working for it. The plaintiff recognized that this alone would not be enough, and therefore it asserted * * * that these employees * * * had *executed* a *contract* in which they promised *not to divulge anything* which they might learn of the plaintiff's methods; and that the *defendants, knowing of this contract,* or at least having *notice* of its existence, *induced* the men to *divulge* the secrets they had learned." (emphasis added)

25. The next two sentences in the Report of the special master, namely, "He immediately told Thomson and his employees how to make the turner operate successfully. It is also significant that the Thomson turner never operated properly until after Oswald's return" are clearly erroneous by Oswald's testimony that "I did *not* work on the turner for the Thomson Machinery Company. That work was carried out by some other members of the firm." The word "immediately" in the above quotation is also clearly erroneous as Oswald returned to Thomson's employ October 14, 1954, and it was not until the following year—1955—that the cane lifter was modified so that it would also serve as a cane turner.

26. The next sentence, namely, "The Master finds that the evidence is to the effect that Oswald was hired to perfect the turner, and did, in fact, aid in this perfection with the experience and knowledge gained in the service of defendants" is a clearly erroneous conclusion for, if Oswald, as he testified, did not work on the Thomson turner, he certainly did not perfect the turner nor aid in this perfection. As a matter of fact, the Wintz (Thomson) turner, as shown by the record was never perfected and was viewed more or less as an abandoned experiment. As heretofore shown, any "experience and knowledge gained in the service" of Patent Holders was

Oswald's own property which he could use for future employers without rendering either Oswald or those future employers liable for the use. Wexler v. Greenberg, *supra.*

27. The last sentence of 7(a) of the Report of the special master, namely, "Furthermore, he called Thomson's attention to the patents at issue in this case," is also clearly erroneous, the Oswald testimony at this point being exactly "The same thing. And I believe that I also called Mr. Thomson's attention that there was a patent pending on turning cane, and that I didn't know whether it would infringe on it or not."

A patent and a patent pending are critically different objects. The apparatus patent, which is the only patent now having any legal significance, was not granted until February 3, 1959. Oswald was testifying circa the period of 1955 although no exact date is stated. He was in all probability referring to the pending application and was no doubt correct in his opinion that "I didn't know whether it would infringe on it or not," and neither did anyone else, including counsel who filed the application, for at that time the application had not been examined by the U. S. Patent Office to ascertain whether its contents complied with any or all of the conditions for patentability. No legal obligation was placed on Thomson by reason of this remark of Oswald's.

28. The statement made in paragraph 7(b) of the Report is clearly erroneous in the following particulars:

i) The word "produced" in line 1 is erroneous as the affidavit evidence offered on behalf of Thomson shows that no infringing devices were produced after 1958. As the apparatus patent was not granted until February 3, 1959, no infringement was committed by production (manufacture) during the term of the patent. The word "produced" should have been "sold." In line 2 "plaintiff" should be "defendant." In line 4 "some" should be "all." In lines 4 and 5, "during the time the patent was in processing

by the Patent Office" should be "during the time the patent application was pending in the U. S. Patent Office." The statement "with the full knowledge that these devices would, in all probability outlast the term of the patent, if properly cared for, and, therefore, would diminish the value of Patent Holders' patent even if it should later turn out to be valid" is an ingenuous statement as the term of the patent is seventeen years to which must be added up to three years additional, as Thomson "sold" the bulk of his turners in 1956, i. e., three years before the grant of the patent, and chain links and their connecting pivots are just not that durable, and in any event there is no evidence to support such a statement, and even if there was, it is not actionable infringement to manufacture and dispose of 138 or any lesser or greater number of devices before the grant of the patent, that is, before the term of the patent begins to run.

29. Master's holding 7(c) on page 4 of the Report is irrelevant because if Thomson manufactured and sold turners for the entire 600 harvesters before the grant of the patent, no action would lie.

30. Master's holding 7(d) on page 4 of the Report is erroneous in lines 1 and 6 in that the words should be "defendant-infringer (Thomson)" and in line 8 "defendants" should be "plaintiffs (Patent Holders)."

The statement beginning in line 1: "Plaintiff-infringer took a calculated risk in infringing the patent * * *" can only apply to the two infringing sales made after the patent was issued (Report of special master, page 3, 7(b), lines 1 and 2).

It is clearly erroneous to hold legal assumption of risk in making, using, or selling any product not covered by a patent "existing" at the time, but later found *ex post facto* to be covered by subsequently issued patent. Lacking the patent, there is no basis on which to

make any calculation and no threat of risk.

It was clearly erroneous to hold "since he had full knowledge as to all facets involved in the patent" unless this holding is restricted to the two devices "sold" after the grant of the patent, because when Thomson made the 138 devices, this all took place pre-patent and hence Thomson did not have at that time "full knowledge as to all facets involved in the patent." The references to Thomson's attempts to produce a turner are matters irrelevant and immaterial to Thomson's liability in an accounting proceeding with reference to patent infringement of another device.

31. Paragraph 7(e) of the Report is clearly erroneous in that, as heretofore shown, Thomson was not the plaintiff in the second suit. Patent Holders brought the suit on the apparatus patent and Patent Holders are, therefore, responsible for part of the eight years of litigation, so that part of the loss in the patents noted by the Report of the special master was sustained by Thomson and occasioned by Patent Holders. This paragraph 7(e) is clearly erroneous in fact and in law.

32. Paragraph 8 of the Report holding that this is an "exceptional" case is, for foregoing reasons, clearly erroneous and even if correct Patent Holders were not "the prevailing party" for reasons established elsewhere.

33. A reading of the entire testimony of the witness Oswald shows that the Findings of the special master in paragraphs 7 and 7(a), (b), (c), (d) and (e) and 8 of the Report are not supported by, and in fact are contradictory of, this testimony and said Findings are clearly erroneous in fact and in law.

34. The note of evidence served by Patent Holders on Thomson before trial was as follows:

"PAUL F. OSWALD. The testimony of this witness will be offered orally as well as his deposition, principally on the issue of inventorship and to establish plaintiff's failure to prove prior use or public use." (R. 42)

There is no suggestion in this note as to any of the arguments now later based on this testimony which would advise Thomson of any other claims of validity and infringement.

35. In 1954 Patent Holders sold only three of their devices. In 1955 Patent Holders sold nine of their devices.

36. Patent Holders distributed only two advertising circulars for bringing their turner to the attention of the purchasing public who were the cane farmers in the cane area of Louisiana.

37. When Thomson entered the market in 1956 with his version of a turner, Patent Holders had no substantial business in or sales of their turner.

38. In 1954 when Patent Holders brought forth their device, there were 600 to 650 Thomson harvesters in use as potential customers for Patent Holders. Even after Thomson's production had ceased in 1958, there were still at least 460 Thomson harvesters still unequipped with turners as potential customers for Patent Holders.

39. With this large untouched potential market and without competition, Patent Holders were still unable to make more than token sales of their product, as shown by the testimony of Mr. LaRose at the hearing before the master in New Orleans on August 18, 1965, from which it appears only three of Patent Holders' turners were sold in 1959; two in 1960; three in 1961; three in 1962; thirteen in 1963, including a block of ten units by a large corporation; and one in 1964.

40. Beginning in 1958 Thomson discontinued manufacturing the old heavy type harvester in favor of a lighter weight Junior harvester which was not adapted, without some change, to accommodate a turner and Thomson discontinued the manufacture and installation of turners at that time. No showing has been made that Patent Holders' turner was revised for attachment to the

then new-type lightweight Thomson Harvester.

41. Patent Holders were demanding of the customers for their turner an advance payment of $1,000 down which more than covered the costs of the parts and fabrication and the balance of approximately $800 on delivery.

42. Before the filing of Patent Holders' application for patent on November 23, 1954, and at least as early as August 1954, Patent Holders' turner was mounted on a harvester belonging to Ross Campesi who publicly used it in the harvesting season of 1954 and continuously from then on.

43. Clause Deposition Exhibit 14, being a list of sales of Patent Holders' turners, contains as the first item the date of purchase as of September 1954 of this turner to Campesi.

44. At that time in 1954, Patent Holders were doing "advertising and demonstration" on their turner, but as Campesi's farm was some forty miles away, Patent Holders installed another of their turners on the harvester owned by J. B. Levert Land Company, also in 1954, on an offer to him "that we would install one of these turners on his machine at no cost in order that people coming into our place would just cross the Bayou * * * to see this device."

45. Patent Holders pleaded that their turner was publicly advertised and vended by Patent Holders and publicly used by Patent Holders' vendees since the latter part of 1954.

46. By the foregoing admissions of record, Patent Holders' invention was disclosed to the public both by descriptive literature, by the physical turner and by public demonstration, before the application for patent was filed, during the pendency of the application and over a period of approximately four and one-half years before the Apparatus Patent containing the only valid claim was granted.

47. In its Answer and Counterclaim to Amended Complaint filed on October 26, 1959 (R. 7), Patent Holders (defendants) alleged:

"Defendants have been engaged in the manufacture and sale of Apparatus for Mechanically Handling Sugar Cane Stalks During Harvesting in accordance with the teaching of Defendants' said Patent 2,871,645, since the latter part of 1954."

48. 35 U.S.C. § 112 requires the specification of the patent application to contain a description of the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains * * * to make and use the same * * *."

49. This is an admission of record that Patent Holders' commercial turner cloaked no trade secret but revealed the invention without reservation to the public. If it did not, the application information to those skilled in the art was deficient in the statutory requirement and thus the patent is invalid.

50. "The record warrants the view that the structure of the improvements and their machine-combination was readily revealed by an inspection, and in this situation the sales which plaintiff had made generally to the trade, together with the demonstrations which they willingly afforded any inquirer about the machine, were entitled to be held to have constituted a public disclosure. 'Matters which are completely disclosed by the goods which one markets cannot be his secret.' Restatement, Torts, § 757, Comment b, Secrecy." Sandlin v. Johnson, 152 F.2d 8, (8th Cir. 1945).

51. When, on January 25, 1957, Patent Holders first notified Thomson of the pendency of an application for patent by letter, the Thomson turner was an accomplished entity in being and the bulk of "sales" of the Thomson turner had already taken place in the previous year of 1956 so that the Thomson turner could not have evolved from any information given in the subsequent year 1957 respecting Patent Holders' pending application.

52. Affidavits of the Patent Holders are on file in the Official File Wrapper of their patent, Exhibit No. 203, made in support of the Petition to Make Special, deposing to knowledge of the Thomson turner since 1955; yet Patent Holders stood by and watched the marketing in 1956 of this bulk of the Thomson turners without any notice or complaint to Thomson until the letter of January 25, 1957 (referred to in Finding 51 above).

53. The claims submitted to Thomson's counsel following the letter of January 25, 1957, were invalid claims so held by the trial judge.

54. After receipt of the letter of January 25, 1957, and after certain searches through prior patents, Thomson's counsel advised Thomson that there was no valid claim submitted by Patent Holders' counsel that would be infringed by the Thomson turner, which opinion has been vindicated by the judgment.

55. When, after Patent Holders' Method Patent was granted on July 23, 1957, followed by a further letter from Patent Holders' counsel calling attention to the grant of the patent and preferring a charge of infringement, Thomson sought a second opinion from Mr. W. D. Keith, who finally was employed to try the cases, and conferences were held in Washington, D. C., and in Thibodaux, Louisiana, with the result that Mr. Keith agreed with Mr. Mawhinney's opinion which is confirmed by the fact that plans were then perfected to launch the litigation, and the first suit against the Method Patent was filed by Thomson in November 1957.

56. Neither Thomson nor Thomson's counsel ever had access to the pending applications for patent of Patent Holders until the patents were granted and made public.

57. The stipulated testimony on behalf of Thomson represented in the affidavit of Cameron L. Morvant shows in paragraph 2 thereof that "at the close of the harvester manufacturing season of the year 1958, only four new harvesters equipped with infringing row turners were left unsold," and in paragraph 3, that Byron C. Thomson "at that time ordered these four harvesters dismantled and the parts returned to inventory," which was done as to two of the harvesters but that purchasers appeared and the last two harvesters were sold, which was against Thomson's orders. Thomson had no intent to infringe. The discontinuance of maunfacture of the turners and the orders to dismantle before the grant of Patent Holders' Apparatus Patent on February 3, 1959, repel any suggestion of deliberate and intentional or willful and wanton infringement. The master's holding in paragraph 7 of the Report that the infringement was deliberate and intentional and the holding that this is an exceptional case within the meaning of 35 U.S.C. 284–5 as held in paragraphs 7 and 8 of the Report are clearly erroneous.

58. There was no claim for relief in the pleadings by Patent Holders under 28 U.S.C. § 1338(b).

59. There was no award in the judgment signed by Judge Wright awarding any relief under 28 U.S.C. § 1338(b) to Patent Holders.

60. "Any finding of fact entered herein which may be construed in whole or in part as a conclusion of law shall be so deemed and treated as if set forth under Conclusions of Law herein." Technicon Instruments Corp. v. Coleman Instruments, Inc., 255 F.Supp. 630 (N.D. Ill.1966).

## CONCLUSIONS OF LAW

The Court agrees with and adopts the following conclusions of law of the special master:

1. There is no issue before this Court of unfair competition, breach of fiduciary relation or unjust enrichment. This issue is not raised in the pleadings, was not considered by the trial judge, and no finding of any unfair competition or unjust enrichment is found in the judgment. Therefore, the master is precluded from a consideration of damages for these matters. In addition, it would

seem that any claim for unfair competition or unjust enrichment would now be prescribed, these actions sounding in tort, which prescribe in one year. (Art. 3536, La.Civil Code) In addition, it would seem that any claim for these damages would be barred by the doctrine of res adjudicata, there having been a judgment and the claimant (defendant-patentee herein) being barred not only as to issues therein decided but as to all issues which he might have raised. (Report, page 5, no. 1)

▪ 2. There can be no damages for infringement except for infringement which occurs *during* the existence of the patent. 35 U.S.C. § 271(a) (" * * * whoever without authority makes, uses or sells any patented invention *during the term of the patent * * *.*"); Gayler v. Wilder, 10 How. 477, 13 L.Ed. 504 (1850); Patton v. United States, 75 F.Supp. 470, 110 Ct.Cl. 195 (1948). In addition to this, the Court feels that it is precluded from any other point of view by the terms of the judgment rendered by Judge Wright, as affirmed by the Fifth Circuit, which reads (paragraph 4):

" * * * and if manufacture, use or sale of said device took place *within the term of the patent* there is infringement." (emphasis supplied)

and in paragraph 6:

"Defendant shall recover of the plaintiff and third party plaintiffs damages adequate to compensate said defendants for *said infringement.*" (emphasis supplied) (Report, page 6, no. 2)

▪ 3. There can be no contributory infringement without direct infringement and without infringement, per se, the provisions of 35 U.S.C. § 271 (b), (c) and (d) do not apply. Aro Mfg. Co. v. Convertible Top Replacement Co., Inc., 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961); Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., 218 F.Supp. 1 (D.Md.1963). (Report, page 6, no. 3)

▪ 4. The infringer bears the burden of proof of the cost of production, of the amount and of profit obtained from the sale of each infringing device. The master feels that a prima facie case of proof of profit has been made and that this is the only satisfactory proof in the record. Even should the master accept patentee's contentions as to the standard for assessment of damages, the proof in support of same was inadequate. In this regard, it is accepted by the master that the profit on the devices sold by plaintiff-infringer was $316.00. Since two devices were sold during the existence of the patent, the profit figure is $632.-00. (Report, pages 6–7, no. 4)

5. There is insufficient evidence in the record to indicate that third party defendants, other than Byron Thomson and Thomson Machinery Corporation are guilty of any infringement, contributory infringement or other action proscribed by 35 U.S.C. § 271. The master does not pass upon any unfair competition, fiduciary breach or unjust enrichment of which these parties might be guilty, since this issue is not before the master as aforementioned. (Report, page 7, no. 7)

Upon the foregoing findings of fact and in addition to the above conclusions of law made by the special master and adopted by the Court, we make the following conclusions of law:

6. The case is one arising solely under the patent laws of the United States for patent infringement and therefore jurisdiction is properly had in this Court.

▪ 7. "It is the claims of the patent which 'measure the invention' and define precisely what the invention is, and the limits beyond which one cannot pass without infringing; therefore it is the claims of the patent to which one must look to determine whether there is infringement." Walker on Patents, Deller's edition, Vol. 3, Section 450, p. 1681; General Steel Products Company, Inc. v. Lorenz, 204 F.Supp. 518 (S.D.Fla. 1962), Conclusion of Law XLVI, affirmed 337 F.2d 726.

8. There can be no infringement of an application for patent during pendency in the United States Patent Office and before the grant of a patent thereon. Cf. 35 U.S.C. § 271.

9. The judgment, not the opinion, controls the accounting. In case of conflict, the judgment prevails. 49 C.J. S. Judgments § 22, p. 51.

10. The judgment deals only and strictly with the matter of patent infringement which is the sole issue raised by the pleadings.

11. The judgment limits recovery to the period following the grant of the patent during the term thereof.

12. The judgment especially excludes recovery for activities occurring prior to the grant of the patent.

13. The judgment limits recovery to infringement of the patent.

14. So far as the judgment is concerned, there is no firm holding of infringement; only a conditional holding that Claim 4 of the Apparatus Patent is valid, reads on Thomson's accused device and if that accused device was manufactured, used or sold within the term of the patent, there is infringement. Judgment, paragraph 4, R. 59

15. 35 U.S.C. § 271(a) defines direct infringement, and (b) and (c) are codifications of branches of the judge-made law of contributory infringement which involves intent to infringe existing patents by present knowledge of the patent claims and the fact that the contribution is an infringement thereof. Aro Manufacturing Co. v. Convertible Top Replacement Co., (ARO II), 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964).

16. There can be no contributory infringement in the absence of direct infringement, and direct infringement cannot occur prior to the grant of the patent. Aro Mfg. Co. v. Convertible Top Replacement Co., (ARO I), 365 U.S. 336, 341–342, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961).

17. The letter dated January 25, 1957, advising of the pendency of Patent Holders' application was a unilateral and gratuitous act on the part of Patent Holders' counsel and had no binding legal effect on Thomson. Official Airlines Schedule Information Service, Inc. v. Eastern Air Lines, Inc., 333 F.2d 672 (5th Cir. 1964). Furthermore, it certainly had no legal effect to create an addition to the term of the apparatus patent to begin with the date of the letter rather than the grant date of the patent, and certainly did not arm Patent Holders with a self-created injunctive process which prohibited Thomson from making, using or selling its accused device during the pendency of the patent application under pain of answering in damages (treble) over a period of time outside the limits set by the grant.

18. With the burden of proving their damages, Patent Holders (third party plaintiffs) served the special master with several briefs (replied to on behalf of Thomson) covering various legal aspects of the case, and finally asked for a hearing which was held in New Orleans on the morning of August 18, 1965, at which some evidence was produced which the master held to be inadequate (Report, page 7, lines 2 and 3). Accordingly, the master held the measure of damages to be Thomson's profits which was in accordance with the demand for judgment pleaded by Patent Holders (Third-Party Complaint, page 4, Demand B. "Recovery of Third-Party Defendants Thomson's Profits.").

19. Patent Holders are not entitled to attorneys' fees in this action. Bissell, Inc. v. E. R. Wagner Mfg. Co., 204 F.Supp. 801 (E.D.Wis. 1962).

20. Patent Holders have not established that they are entitled to damages for any period prior to issuance of their apparatus patent containing valid Claim 4. Bissell v. Wagner, *supra*.

21. It is the established rule that no damages are allowable except for the period which follows the grant of a patent for infringement of its claims during the term thereof. Bissell v. Wagner, *supra*, and cases cited therein.

22. The manufacture and sale of a copied device during the pendency of another's application for a patent therefor does not constitute contributory infringement even though the life expectancy of said product may extend into the term of the patent grant. Bissell v. Wagner, *supra*.

23. Jones v. Radio Corporation of America, 131 F.Supp. 82, (S.D.N.Y. 1955), and other decisions cited by plaintiffs are not authority for the contention that damages for contributory infringement would be allowable for a period prior to infringement after issuance of a patent. Bissell v. Wagner, *supra*.

24. The only detriment suffered and proved by Patent Holders incident to any infringement occurring during the term of their apparatus patent was for the sale of the two infringing turners sold by Thomson subsequent to the issuance of the patent.

25. Patent Holders, third-party plaintiffs, did not meet their burden of establishing that defendants, Thomson, had a deliberate and intentional purpose to infringe valid Claim 4 of their apparatus patent by manufacture, installation and/or sales of the accused device.

26. Even if Thomson hired back Oswald, who had participated in the development of the patented device and used the knowledge gained from this engineer in the production of a competitive device, as held by the special master in paragraph 7(a), page 2 of the Report, this conduct is not actionable, unless a trade secret belonging to Patent Holders was the subject matter and unless Patent Holders had previously procured from Oswald a contract in which he promised not to divulge the secret and unless Thomson had knowledge of the contract or at least knew of its existence and induced Oswald to divulge the secret. Conmar Products Corp. v. Universal Slide Fastener Company, Inc., 172 F.2d 150 (2d Cir. 1949).

27. The crucial issue as to an alleged misappropriation of confidential information gained from Patent Holders by Oswald is whether the information constituted a skill or proficiency acquired by Oswald in the employment of Patent Holders, in which event the appropriation is not actionable, or whether the information involved the disclosure of trade secrets. Hahn and Clay v. A. O. Smith Corp., 320 F.2d 166, 170, 171, 175 (5th Cir. 1963).

28. In an action for wrongful use of a secret by Thomson, Patent Holders' complaint must allege that there is a protectable secret and that it has been used unlawfully, Trade Secrets by Ridsdale Ellis, 1953, page 318, Section 232, and that Thomson agreed that knowledge of it obtained by him was confidential and remained the property of Patent Holders. Brooklyn Syrup Co. v. Shapiro, 72 USPQ 334 (1947).

29. In those cases cited by Patent Holders which involve assessment of damages for acts performed pre-patent, the basis was an issue of unfair competition or unjust enrichment but not under the patent laws of the United States as held in Hoeltke v. C. M. Kemp Mfg. Co., 80 F.2d 912 (4th Cir. 1935). No recovery of any kind was awarded in Jones v Radio Corporation of America, *supra*, or Weyerhaeuser Timber Co. v. Bostitch, 178 F.Supp. 757 (D.R.I. 1959).

30. "It has often been asserted that, according to the principles of universal equity, an inventor has an exclusive property in his invention. Independent of statute law, no such right exists. He has no such exclusive property any longer than he keeps it secret; * * * but the moment he discloses it, he abandons his exclusive property in it, and others acquire the right to use the invention. The exclusive right to use an invention after disclosure can exist only by virtue of some statute law, enacted by the legislature as the representative of the people." Walker on Patents, Deller's edition, 1937, Vol. 1, pages 23, 24.

31. "Some inventors sometimes attempt to reap reward for their inventions by means of secrecy, instead of by means of patents. Such attempts are

legitimate; but they are not applicable to designs, and are seldom applicable to machines or manufactures." (Quoted in § 206 Trade Secrets, Deller's Walker on Patents, 2d Ed., Vol. 4, page 3)

32. An inventor may deprive the public of the benefits of his invention by keeping it secret. "But that right disappears when the public uncovers the secret by fair means: that is, means other than breach of a contractual or confidential relationship." (Deller's Walker on Patents, 2d Ed., Vol. 4, Section 206, pp. 4 and 5)

33. Patent Holders, to perfect their claim for breach of confidential disclosure, must establish the following:

"(i) possession by the plaintiff of knowledge or information which is not generally known,

"(ii) communication of this knowledge or information by the plaintiff to the defendant under an express or implied agreement limiting its use of disclosure by the defendant, and

"(iii) use or disclosure by the defendant of the knowledge or information so obtained in violation of the confidence, to the injury of the plaintiff." Kinnear-Weed Corporation v. Humble Oil & Refining Company, 150 F.Supp. 143 (E.D.Tex.1956), Affirmed, same title, 259 F.2d 398, 399 (5th Cir. 1958).

34. Patent Holders had the burden of proving each of the foregoing essential elements. (Trade Secrets by Ridsdale Ellis, 1953, Sections 236 and 251)

35. The evidence establishes that Patent Holders' turner was on public display and demonstration, on sale and actually sold beginning at least as early as September 1954, so Patent Holders did not possess any knowledge or information which was not generally known and which Patent Holders could claim was disclosed in confidence to Thomson. Sandlin v. Johnson, 152 F.2d 8 (8th Cir. 1945); Northup v. Reish, 200 F.2d 924, (7th Cir. 1953); Colgate-Palmolive Co. v. Carter Products, Inc., 230 F.2d 855, (4th Cir. 1956); Baum v. Jones & Laughlin Supply Co., 233 F.2d 865, (10th Cir. 1956); and Kinnear-Weed Corp. v. Humble Oil & Refining Co., 150 F.Supp. 143, (E.D.Tex.1956).

36. There was not any express or implied agreement limiting Thomson's use or disclosure of any information or knowledge.

37. Patent Holders have failed to discharge their burden of proving the elements necessary to support a claim for breach of confidential disclosure. [(See the similar Conclusions of Law LXXVI to LXXX in General Steel Products Co., Inc. v. Lorenz, 204 F.Supp. 518 (S.D.Fla. 1962), Affirmed 337 F.2d 726 (5th Cir. 1964).]

38. On the issue of liability for alleged appropriation of another's ideas, the Fifth Circuit requires proof that (1) the idea was novel, (2) that its disclosure was made in confidence, and (3) that it was adopted and used by the alleged wrongdoer. (Deller's Walker on Patents, 2d Ed., Vol. 4, Section 207, page 6, citing Official Airlines Schedule Information Service v. Eastern Air Lines, 333 F.2d 672, (5th Cir. 1964).

39. The requisite elements of novelty and confidential relationship are absent in this case. Moreover, this *Eastern Air Lines* case holds on page 674:

"(3) We next turn to the record before us and find that nowhere is there any suggestion that the *Oasis* idea was communicated to Eastern or any of the other airlines in confidence, or with an advance contract or understanding concerning the use of that idea. There is no factual problem concerning the question of confidential relationship. The problem here is whether one person, by his gratuitous and unilateral act, may impose upon another a confidential relationship. That he may not is clear. Lueddecke v. Chevrolet Motor Co., 8 C.A., 70 F.2d 345."

40. The letter which Mr. Garvey wrote to Mr. Mawhinney on January 25, 1957, was a gratuitous and unilateral act

which could not legally impose upon Thomson a confidential relationship. Official Airlines Schedule Information Service v. Eastern Air Lines, *supra*.

41. "The Congress shall have Power * * * to promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Rights to their respective Writings and Discoveries." (Constitution of the United States, Article I, Section 8, Page 14 of printed pamphlet Patent Laws)

42. "Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, for the term of seventeen years, of the right to exclude others from making, using, or selling the invention throughout the United States, referring to the specification for the particulars thereof." 35 U.S.C. § 154. Page 26 of Patent Laws.

43. "Now therefore these Letters Patents are to grant unto the said Royal J. LaRose and Edward P. Clause, their heirs or assigns for the term of Seventeen years from the date of this grant the right to exclude others from making, using or selling the said Invention throughout the United States.

"In testimony whereof I have hereunto set my hand and caused the seal of the Patent Office to be affixed at the City of Washington this third day of February, in the year of our Lord one thousand nine hundred and fifty-nine, and of the Independence of the United States of America the one hundred and eighty-third.

　　　Signed ROBERT C. WATSON
　　　Commissioner of Patents"

(Grant of Patent Holders' Apparatus Patent)

44. In Gayler v. Wilder, 51 U.S. 477, 13 L.Ed. 517 (1850), the Supreme Court of the United States held at page 493:

"The inventor of a new and useful improvement certainly has no exclusive right to it, until he obtains a patent. This right is created by the patent, and no suit can be maintained by the inventor against any one for using it before the patent is issued."

45. In Royal Die Cutting & Heat Sealing Corp. v. Duro Pen Company, Inc., 223 F.Supp. 384, on page 386 (S.D.N.Y.) the Court held:

"After issuance of the patent defendant could not recover for acts occurring before that time. See Zalkind v. Scheinman, 139 F.2d 895, 904–905, (2d Cir. 1943)."

46. "It is axiomatic that only a claim of a patent can be infringed. The claims of a patent measure the scope of a patent monopoly." Stearns v. Tinker & Rasor, 252 F.2d 589, 596 (9th Cir. 1958).

47. "The Patent Office was established for the fundamental purpose of examining patent applications pending before it against the background of prior art and knowledge, and until this has been done, the fact that there is anything novel or that invention exists cannot be ascertained. Until such examination is completed and a patent issued, the patentee has established no monopoly to an invention. In accordance with the patent statutes, when a patentee is given a monopoly as to his invention, as expressed in the claims of the issued patent, such monopoly is limited to a period of seventeen years." Gearon v. United States, 115 F.Supp. 910, 911, 126 Ct.Cl. 548 (1953); § 205 Common Law Rights quoted in Deller's Walker on Patents, 2d Ed., Vol. 4, page 3.

48. A pleading which alleges infringement of a patent during the pendency of an application for patent has no significance in law and fails to state a claim upon which relief may be granted.

49. The demand made in Patent Holders' pleadings for damages resulting from infringement alleged to have taken place during the pendency of the application for patent likewise has no significance in law, and no damages can be awarded for any alleged infringement taking place during this period.

50. Patent applications are preserved in secrecy in the United States Patent Office and only the inventor-applicant and his duly appointed attorney whose written Power of Attorney is of record in the Official File, or those to whom a written Power to Inspect is of record in the United States Patent Office are admitted access to the application.

51. The allegation in Patent Holders' pleadings that Thomson had knowledge of the pendency of or had knowledge of the application creates no liability in Thomson or his company for any infringement of a patent later granted.

52. The allegations of Conclusion 51 are self serving, have no significance in law and do not state a claim on which relief can be granted.

53. Neither knowledge of an application for patent or of the pendency thereof can operate to accelerate the grant rights under a patent to begin before the actual grant date nor create a period of exclusive right in advance of, in addition to, or in enlargement of the period of seventeen years authorized by law.

54. No showing has been made that any trade secret was in the exclusive possession of Patent Holders with respect to the Patent Holders' invention:

(a) after September 1, 1954, when sale was made by Patent Holders to Ross Campesi of a commercial turner embodying the invention;

(b) after demonstrations were made to prospective customers by Patent Holders of the Campesi and Levert turners;

(c) after Patent Holders placed one of their turners on the Levert harvester which was kept just across the bayou and began demonstrations of the same to the cane farmers, and

(d) after Patent Holders publicly sold their turners on the market made in accordance with their application for patent.

55. Paul F. Oswald, Thomson's engineer, was never involved in a confidential relationship with Patent Holders.

56. To hold Thomson's acts before patent as patent contributory infringement under 35 U.S.C. § 271(b) or as unfair competition under 28 U.S.C. § 1338(b), both of which holdings have been denied by the trial court and the special master, it is necessary to impute to Thomson knowledge that on January 25, 1957, when the pendency of Patent Holders' application was first called to his attention containing only invalid claims, subsequent in the prosecution of the application an allowable claim (Claim 4 of the apparatus patent) was going in futuro to be presented more than a year and a half later which would survive to validity after a trial at which both claims of the method patent and all other claims of the apparatus patent were held invalid.

57. The *Radio Corporation* case, the *Weyerhaeuser* case and the other cases cited by Patent Holders are not authority for holding that acts occurring before the grant of a patent can be actionable inducement to infringe a claim of a later issued patent.

58. It is not a calculated risk as held by the special master, page 4, paragraph (d), but everyone's right, freely to make, use and sell any unpatented device. Sears, Roebuck & Co. v. Stiffel Company, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964).

59. It was not erroneous for the master to use infringer's (Thomson's) profits as the measure of damages even though the statute does not prescribe that profits are recovered as such. Graham v. Jeoffroy Mfg. Co., 253 F.2d 72 (5th Cir. 1958); Henry Hanger & Display Fixture Corp. of America v. Sel-O-Rak Corp., 270 F.2d 635 (5th Cir. 1959); and Zysset v. Popeil Bros., 199 F.Supp. 594 (N.D.Ill.1961).

60. Since two machines were sold by Thomson after the issuance of the apparatus patent, damages for the sale of those two machines should be awarded the Patent Holder. The master con-

cluded that the profit figure on the two machines sold during the existence of the patent was $632.00 and the Court orders that judgment be entered accordingly with legal interest thereon from the date of judicial demand until paid.

61. "Any conclusion of law entered herein which may be construed in whole or in part as a finding of fact shall be so deemed and treated as if set forth under Findings of Fact herein." Technicon Instruments Corp. v. Coleman Instruments, Inc., 255 F.Supp. 630 (N.D.Ill. 1966).

Judgment will be entered accordingly.